No. 12341

IN THE SUPREME COURT OF THE STATE OF MONTANA

1973

---

THE STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

JERRY GALLAGHER,

Defendant and Appellant.

---

Appeal from: District Court of the Thirteenth Judicial District,
Hon. Robert H. Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Sandall, Moses and Cavan, Billings, Montana
D. Frank Kampfe argued, Billings, Montana

For Respondent:

Hon. Robert L. Woodahl, Attorney General, Helena,
Montana
Jonathan B. Smith, Assistant Attorney General, argued,
Helena
Harold F. Hanser, County Attorney, argued, Billings,
Montana

---

Submitted: March 28, 1973

Decided: MAY - 1 1973

Filed: MAY - 1 1973

_Thomas J. Kearney_
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from a judgment of conviction of murder in the first degree entered on a jury verdict in the thirteenth judicial district, county of Yellowstone. After denial of his motion for a new trial, defendant appealed.

Defendant Jerry Gallagher raises four issues on appeal:

1. Defendant is entitled to a new trial insofar as his defense counsel had previously prosecuted him.

2. The trial court erred in failing to grant defendant's motion for new trial based upon newly discovered evidence.

3. The trial court erred in failing to grant defendant's motion to suppress certain evidence obtained in violation of his Fourth Amendment rights.

4. The trial court erred in admitting certain evidence obtained in a search incident to defendant's arrest where the arrest warrant was predicated upon an insufficient showing of probable cause.

On September 7, 1971, a body was discovered on "Hardin Hill" on U.S. Highway 87 near Billings, Montana. The body was identified as that of one Eldon Egan. The body was observed by tourists, who had stopped at a vista point to observe the Yellowstone Valley, some 75 to 100 feet below the vista point on a steep incline beyond a barbed wire fence which ran parallel to the highway. It was later observed the fence had been cut at a point not far from the body. The tourists stopped a Montana Highway Patrolman, Leo Burnett, and showed him the body. He immediately notified the sheriff who took a team of deputies and detectives to the scene, arriving at about 1:20 p.m.

A careful combing of the area revealed a fingernail clipper, two shell casings and one spent bullet. At the vista pulloff, above the body, there was a trash can in which was found a paper bag containing a blood stained pillowcase, a block of wood, and a comb. A second bag contained a broken Vodka bottle.

Dr. Gordon L. Cox, a Billings pathologist, examined the body. His examination revealed Egan had been severely beaten and shot twice in the head. One of the shots had been fired through the roof of the mouth. Either of the bullet wounds would have produced instant death. A .32 caliber slug was found in the skull and the expended slug found near the body was a .32 caliber.

Deputies of the sheriff's office and Billings police officers immediately began investigations to ascertain Egan's activities in the community. Much of the investigation concerned Billings southside bars and their clientele.

Testimony at trial revealed that defendant and one John Curry, who was also charged and later acquitted of the murder, were together in the Montana Bar in the early hours of September 7, 1971. Egan had also been in the bar and testimony indicated that he was carrying a .32 caliber revolver. There was testimony that Curry made the statement to someone at the bar when Egan came into the bar "not to move, you might get into the cross fire". This person, James Lee Marvidikis, was not available for trial but later in a deposition taken in Billings, March 16, 1972, and introduced at the time of the motion for a new trial, testified Curry had a gun, at one time had it at least partially out from under his belt and that Curry told Marvidikis, "There is going to be a beef. * * * Hold still, don't move, you might get cross-fired."

Investigation revealed and testimony was later given, that defendant and Egan had a few nights before been involved in a "beef" at the Empire Bar and that Egan, who came out the loser, had threatened to "get" defendant. Testimony revealed both men had lived with a woman named Ida May France Egan, also known as Smoky Walker, and that the altercation had developed because Egan at the time out out of favor and defendant was being favored.

- 3 -

The investigation narrowed down to focus upon the whereabouts and activities of Curry and defendant. At about 9:00 p.m. on the evening of September 8, the day after the discovery of Egan's body, the sheriff received a call from a Mrs. Ruth Parker, complaining that a prowler was in or had been in her home. Knowing that defendant had been living there, the sheriff and two deputies went to her home and upon arriving there were requested by Mrs. Parker to search the house, including the basement. While in the basement, accompanied by Mrs. Parker, the sheriff observed what appeared to be a blood stained shirt and with Mrs. Parker's permission took the shirt, which had a tear on the right side of the rear of the shirt. He also took a pair of trousers and a pair of stockings that appeared to be blood stained. At trial, only the shirt had identifiable blood stains and the blood was type A. Both defendant and Egan had type A blood.

Concerning the blood stained pillowcase found in the trash can near where the body was found, an extensive investigation traced it to the home of one Lamona Northey in Butte, Montana. Miss Northey, aged 16, is the daughter of one Neddie St. Amant of Butte, a friend of John Curry. Miss Northey testified that John Curry came to her home on the evening of August 29, 1971; that he slept on the couch; that she gave him a pillow covered by the pillowcase found in the trash can; that the next day Curry took the pillow out to his car; and, that she had not seen it again until it was shown to her by investigating officers at Butte on November 30, 1971. She identified the pillowcase by the embroidery on it and indicated a particular interest in it because it had been made by her grandmother and that she had intended to embroidery over it due to the fact some of the colors had faded.

Defendant and Curry were arrested one week after Egan's death in a remote cow camp in Wyoming. The car they were driving, which belonged to Curry's son, was impounded and searched under a warrant issued by a Wyoming magistrate. Testimony of witnesses at trial established that Curry and defendant had washed the car,

inside and out, while at the cow camp. They were observed washing the mats in a horse tank and hanging them to dry on a fence. Blood stains were found on the floor mats, and on a piece of cardboard taken from the trunk of the car, but the stains were not in sufficient amounts to establish whether they were human blood stains or to be typed. During the search by Sheriff Hladky of Wyoming the following items were taken from the car, processed and sent to the FBI and later introduced into evidence: a pair of gloves, a small suitcase containing clothes, a motel key, front floor mats, and a piece of cardboard from the trunk of the car.

Defendant and Curry were charged with the death of Egan. Bail was set at $25,000 but later revoked on motion by the county attorney. Private counsel appeared for both defendants and re-presented them until December 20, 1971, when an affidavit was filed by defense counsel setting forth that he could not represent either defendant to the possible prejudice of the other. The withdrawal was authorized and defendant requested appointment of counsel alleging he was without funds to hire counsel. It is noted that after being ably defended by the public defender he found funds on appeal to hire private counsel. Defendant did not testify at trial.

Defendant's first issue on appeal alleges error in that defense counsel John Adams had previously prosecuted defendant. Defendant relies on In re Petition of Lucero, _____Mont._____, 504 P.2d 992, 30 St.Rep. 161. We hold Lucero not applicable to the facts of the instant case.

This Court recently considered this question in In re Petition of Romero, _____Mont._____, _____P.2d _____, 30 St.Rep. 440, quoting from In re Petition of Gary Lynn Allen, _____Mont. _____, _____P.2d____, 30 St.Rep. 344:

> "As to the first two sentences their period of
> time had long since expired and * * * defense
> counsel would be free to accept appointment since
> he was no longer involved in the prosecution."

We further noted in Romero:

"This Court takes judicial notice of the fact that several of our most eminent and successful criminal defense lawyers are former prosecutors; and that in no case has our attention ever been called to any lack of interest, effort or competency because of this factor."

Section 94-3509, R.C.M. 1947, the statute prohibiting counsel from appearing as defense counsel for a person he previously had prosecuted, refers to the same case; it has no application to counsel appearing to defend at a later time and in a different case.

In addition, here the trial court recognized the problem of the appointment of defense counsel and held a special hearing at which the following colloquy occurred:

"THE COURT: Very well, that order authorizing endorsement of the witness is signed. I might ask Mr. Gallagher at this time --- I know when I appointed Mr. Adams to represent you I asked you if you had a preference between Mr. Adams and Mr. Whalen and you stated that you did prefer Mr. Adams, and I am presuming from that selection that you hold no grudges against Mr. Adams apparently for his previous work as County Attorney and you do feel that he is a good attorney and that he is doing and will do as good as he can for you in your behalf. Am I correct in that assumption?

"DEFENDANT GALLAGHER: Yes, Your Honor.

"THE COURT: And you are satisfied with him as your attorney and the work he has done for you up to now and so on?

"DEFENDANT GALLAGHER: Yes, Your Honor.

"THE COURT: You do trust and depend on him?

"DEFENDANT GALLAGHER: Yes.

"THE COURT: Very well. Okay."

Here defendant had a choice, he could have picked Mr. Whalen, an experienced counsel, but chose Mr. Adams. In so doing, he waived any right to demand a new trial on this issue.

Defendant's second issue concerns whether the trial court erred in not granting a new trial based on newly discovered evidence.

In State v. Greeno, 135 Mont. 580, 586, 342 P.2d 1052, this Court established criteria to be met before a new trial will be

granted on the basis of newly discovered evidence. There it said:

> "(1) That the evidence must have come to the knowledge of the applicant since the trial; (2) that it was not through want of diligence that it was not discovered earlier; (3) that it is so material that it would probably produce a different result upon another trial; (4) that it is not cumulative merely ---that is, does not speak as to facts in relation to which there was evidence at the trial; (5) that the application must be supported by the affidavit of the witness whose evidence is alleged to have been newly discovered, or its absence accounted for; and (6) that the evidence must not be such as will only tend to impeach the character or credit of a witness. To some of these there may be, and doubtless are, exceptions. For illustration: the cumulative evidence may be so overwhelmingly convincing as to compel the conclusion that to sustain the verdict would be a gross injustice, or the impeaching evidence may demonstrate perjury in the witnesses upon whose evidence the verdict is founded."

See also: State v. Best, _____Mont._____, 503 P.2d 997, 29 St. Rep. 1045.

Defendant relies heavily on several issues which he classifies as newly discovered evidence in his petition for a new trial:

(1) The fact that his counsel on appeal, who had represented John Curry at his trial, had on examination of Lamora Northey raised some doubt as to her positive identification of the pillowcase at defendant's trial.

(2) The testimony of Forence Imsande who testified at Curry's trial, but did not testify at defendant's trial.

(3) The testimony of Mr. and Mrs. Newt Kirkland, alibi witnesses for Curry, that Curry was at their home from the early hours of the morning of September 7, 1971, until about 10 a.m. the next morning.

We find the trial court did not err in denying a new trial due to the fact defendant failed to produce sufficient new evidence to support his petition for a new trial.

First, defendant's allegation that Miss Northey materially varied her testimony at the Curry trial from that given at defendant's trial is subject to question. As previously noted, Miss Northey was sixteen years old, her mother was a friend of Curry, and she was not what could be termed a friendly witness for the state; she gave a statement in November 1971 to the deputies

- 7 -

identifying the pillowcase and later testified in accordance with that statement at defendant's trial, and it was not until the night before she testified at Curry's trial that she had any change of mind. Last, but not least, upon cross-examination at Curry's trial when asked to review her previous statements as to truth, she admitted they were true. The trial court noted, and we concur, one can only speculate as to what she might say on a third trial. Obviously, the trial judge was not impressed that this was newly discovered evidence entitling defendant to a new trial.

Second, Florence Imsande testified at Curry's trial but did not at defendant's trial. Her testimony was that she saw defendant between 11:30 p.m. and 12:00 midnight on the night of Egan's death; that defendant was wearing a shirt freshly stained with blood; and, that when she questioned him about it defendant said it came from injuries received in a fight. Mrs. Imsande was a clerk at the Frontier Club in Billings. On cross-examination she stated she had sold defendant a bottle of Vodka, she thought it was Gordon's, but admitted they sold Smirnoffs--the type bottle found in the trash can.

At defendant's trial no testimony was produced indicating that anyone had seen defendant after midnight September 7 with blood on his shirt.

Mrs. Imsande testified at Curry's trial that she had known defendant since he was a boy at Lewistown. Both she and defendant must have been aware of this so-called new evidence before his trial, most certainly it is not evidence that came to defendant's attention after trial and obviously with any diligence it could have been produced at his trial.

Third, the testimony of Mr. and Mrs. Newt Kirkland, two alibi witnesses at the Curry trial. Mr. Kirkland is an admitted exconvict and on oral argument was described by the county attorney as a man "out on a bond of $75,000 from a recent bank robbery in the midwest where he had lost an arm in a gun fight." The

- 8 -

Kirklands testified at Curry's trial that they saw Curry shortly after 1:00 a.m. on the 7th on the southside of Billings, that he was a friend, that he had been drinking, and that they took him home with them and he spent the night at their ranch. They testified they brought him to town about 10:00 a.m. the next morning. How this qualified as to defendant as newly discovered evidence, escapes us. Curry and defendant were jailed in adjoining cells where they could talk to each other; Kirklands visited Curry at least once and probably several times while he was in jail, and the Kirklands knew defendant. If this evidence had been either relevant or truthful it could have easily been secured by defendant before trial, had he exercised due diligence.

This Court in State v. Jones, 32 Mont. 442, 454, 80 P. 1095, stated:

> "* * * a motion for a new trial is addressed to the sound legal discretion of the trial court."

Here, there was no abuse of that sound discretion by the trial judge in denying defendant's motion for a new trial. The requirements of Greeno simply had not been met.

Defendant's third issue concerns the search of defendant's room and seizure of clothing found there. Fourth Amendment to the United States Constitution; Art. III, Sec. 7, Montana Constitution. Sections 95-701 and 95-718, R.C.M. 1947, set forth the standards for search and seizure.

Section 95-701, R.C.M. 1947, states:

> "A search of a person, object or place may be made and instruments, articles or things may be seized in accordance with the provisions of this chapter when the search is made:
>
> "(a) As an incident to a lawful arrest.
>
> "(b) With the consent of the accused or of any other person who is lawfully in possession of the object or place to be searched, or who is believed upon reasonable cause to be in such lawful possession by the person making the search.
>
> "(c) By the authority of a valid search warrant.
>
> "(d) Under the authority and within the scope of a right of lawful inspection granted by the law."

Section 95-718, R.C.M. 1947, states:

"Instruments, articles or things lawfully seized
are admissible as evidence upon any prosecution
or proceeding whether or not the prosecution or
proceeding is for the offense in connection with
which the search was originally made."

Section 95-701 (d), R.C.M. 1947, is controlling, for the

sheriff had prior justification for his presence in defendant's

room. While engaged in a search for a prowler, the sheriff came

upon a blood stained shirt, and what appeared to be blood stained

pants and sox belonging to defendant, upon whom focus had centered

in regard to Egan's death. The sheriff had no prior knowledge

that he would find such evidence nor could he have anticipated

such a find.

Such evidence is acceptable into evidence and has been so

held under the "plain view" doctrine discussed in Coolidge v.

New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L ed 2d 564, 582.

There the court said:

"It is well established that under certain circum-
stances the police may seize evidence in plain view
without a warrant.* * *.

"An example of the applicability of the 'plain view'
doctrine is the situation in which the police have a
warrant to search a given area for specified objects,
and in the course of the search come across some other
article of incriminating character. [Citing authority]
Where the initial intrusion that brings the police
within plain view of such an article is supported, not
by a warrant, but by one of the recognized exceptions
to the warrant requirement, the seizure is also legiti-
mate. Thus the police may inadvertently come across
evidence while in 'hot pursuit' of a fleeing suspect.
[Citing authority] And an object that comes into view
during a search incident to arrest that is appropriately
limited in scope under existing law may be seized with-
out a warrant. [Citing authority] Finally, the 'plain
view' doctrine has been applied where a police officer
is not searching for evidence against the accused, but
nonetheless inadvertently comes across an incriminating
object. Harris v. United States, 390 U.S. 234, 19 L Ed
2d 1067, 88 S.Ct. 992; Frazier v. Cupp, 394 U.S. 731,
22 L Ed 2d 684, 89 S.Ct. 1420; Ker v. California, 374
U.S.,at 43, 10 L Ed 2d, at 743. * * *

"What the 'plain view' cases have in common is that the
police officer in each of them had a prior justification
for an intrusion in the course of which he came inad-
vertently across a piece of evidence incriminating the
accused. The doctrine serves to supplement the prior
justification---whether it be a warrant for another object,

hot pursuit, search incident to lawful arrest, <u>or some</u> <u>other legitimate reason for being present unconnected</u> <u>with a search directed against the accused</u>--- and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.* * *

"* * *Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous--to the evidence or to the police themselves--to require them to ignore it until they have obtained a warrant particularly describing it.

"The limits on the doctrine are implicit in the statement of its rationale. The first of these is that plain view <u>alone</u> is never enough to justify the warrantless seizure of evidence. * * *

"The second limitation is that the discovery of evidence in plain view must be inadvertent. * * *" (Emphasis added).

The rule is: Where there is prior justification for the police to search an area, and in searching the area, they inadvertently find incriminating evidence which they had no reason to anticipate, they may lawfully seize that incriminating evidence. State v. Quigg, 155 Mont. 119, 467 P.2d 692; State v. Williams, ____Mont.____, 502 P.2d 50, 29 St.Rep. 802; State ex rel. Wilson and Hoffer v. District Court, ____Mont.____, 498 P.2d 1217, 29 St.Rep. 523; United States v. Mitchell, 458 F.2d 960 (9th Cir.1972).

Here all the requirements of the "plain view" doctrine enunciated in <u>Coolidge</u> were met and the evidence was admissible.

Defendant's fourth and final issue concerns whether the search of John Curry's automobile and the seizure of articles therefrom was a violation of defendant's constitutional rights under the Fourth Amendment to the United States Constitution.

A. Defendant made no timely motion to suppress the evidence taken from John Curry's car. Section 95-1806, R.C.M. 1947, provides for the motion to suppress evidence allegedly illegally seized, and reads:

"(a) A defendant aggrieved by an unlawful search and seizure may move the court to suppress as evidence anything so obtained.

- 11 -

"(b) The motion shall be made before trial unless for good cause shown the court shall otherwise direct.

"(c) The defendant shall give at least ten (10) days' notice of such motion to the attorney prosecuting or such other time as the court may direct. The defendant shall serve a copy of the notice and motion upon the attorney prosecuting.

"(d) The motion shall be in writing and state facts showing wherein the search and seizure were unlawful.

"(e) If the allegations of the motion state facts which if true show that the search and seizure were unlawful the court shall conduct a hearing into the merits of the motion.

"(f) The burden of proving that the search and seizure were unlawful shall be on the defendant.

"(g) If the motion is granted the evidence shall not be admissible against the movant at any trial of the case."

This Court has set forth the rule for suppressing evidence in State v. Callaghan, 144 Mont. 401, 406, 396 P.2d 821:

"'One wishing to preclude the use of evidence obtained through a violation of his constitutional rights must protect himself by timely action. If he has had opportunity to suppress the evidence before trial, and has failed to take advantage of his remedy, objection to the evidence upon the trial will not avail him.'

"* * * Of course, if the first knowledge of the evidence comes at the trial stage then objection is proper at that time. [Citing authority]."

See also: State v. Souhrada, 122 Mont. 377, 385, 204 P.2d 792.

Here no motion was made for suppression of the floor mats or the cardboard taken from the Curry automobile. Defendant's objection did not raise any question as to the legality of the search, and the raising of the issue on appeal before this Court is not timely.

B. Defendant has no standing to object to the introduction of evidence taken from the John Curry car. The rule as to who can qualify as a person aggrieved by an unlawful search is set forth in Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L ed 2d 697, 702, where the court said:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search and seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. * * *

- 12 -

"Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy."

This rule was reaffirmed in Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L ed 2d 176. It was also applied by this Court in State v. Dess, 154 Mont. 231, 462 P.2d 186.

C.   Was there probably cause for the search warrant to issue in Wyoming?

Here, the record indicates defendant did not question the validity of the search warrant issued in Wyoming. He alleges a subsequent search was made in Billings, Montana without a warrant. We find no merit to this allegation. Sheriff Hladky of Wyoming obtained a valid search warrant from a Wyoming magistrate, seized certain items, marked them, turned them over to Sheriff Meeks of Yellowstone County and testified at the trial. The search was legal and the evidence taken from the car was proper.

It is recognized that this is a jury verdict based entirely on circumstantial evidence, but as was said in State v. Cor, 144 Mont. 323, 326, 396 P.2d 86:

"Circumstantial evidence is not always inferior in quality nor is it necessarily relegated to a 'second class status' in the consideration to be given it. The very fact it is circumstantial is not a sufficient allegation to justify a reversal of the judgment * * *. The test is whether the facts and circumstances are of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt. If such be the case, then the court should not, indeed cannot, set aside the solemn findings of the trier of the facts."

The judgment of the trial court is affirmed.

Associate Justice

- 13 -

We Concur:

*[signature]*

*[signature]*

*[signature]*

Associate Justices.

*[signature]*

Hon. Edward T. Dussault,
District Judge, sitting for
Chief Justice James T. Harrison.

- 14 -