No. 82-112

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

HARVEY MORSETTE and
MELVIN MORSETTE,

Defendants and Appellants.

Appeal from: District Court of the Twelfth Judicial District,
In and for the County of Hill
Honorable B. W. Thomas, Judge presiding.

Counsel of Record:

For Appellants:

Altman & Lilletvedt, Havre, Montana
Brian Lilletvedt argued, Havre, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
James Scheier argued, Intern, Office of Attorney General,
Helena, Montana
Ronald Smith, County Attorney, Havre, Montana

Submitted: September 20, 1982

Decided: November 10, 1982

Filed: NOV 10 1982

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Defendants were convicted of burglary and theft in a nonjury trial held in the District Court of the Twelfth Judicial District, Hill County. Prior to trial, defendants made a motion to suppress illegally seized evidence, which was denied. From the judgment of conviction, defendants appeal.

On April 1, 1981, a farm owned by John Gabriel, located 13 miles west of Box Elder, was broken into and several items of personal property were taken. The farm is equipped with an alarm system which is activated whenever anyone attempts to illegally enter several of the buildings on the farm. The alarm system works by sending out prerecorded telephone messages to the local sheriff's department and to the homes of several neighbors whenever the alarm is activated.

At 4:15 p.m., Erma Solberg received a prerecorded message at her home in Box Elder. After waiting 5 to 10 minutes to determine if the message was a false alarm, she drove west to the Gabriel farm to investigate. On the road, she noticed only one dust cloud, indicating that only one vehicle was approaching from the west. As the vehicle approached, Erma Solberg observed that the vehicle was travelling quite fast. Because the vehicle was unfamiliar to her, she noted that it was a blue and white pickup truck with a license number of 12T-D55. Approximately 20 minutes elapsed from the time Erma Solberg received the alarm until she saw the pickup. After meeting the pickup, Erma Solberg continued west toward the farm.

About 10 minutes after the alarm was activated, another neighbor, Roy Solberg, drove 2 miles east to the Gabriel farm to investigate. Solberg did not meet any traffic as he

-2-

approached the farm. He found tire tracks in the driveway which entered and left from the east. Solberg remembered that he had not seen tire tracks when he drove by the farm in the morning. He also noticed that a door to one building was damaged, and a window was broken out of another building.

Roy Solberg continued to drive east past the farm, and met Peter O'Laughlin, a deputy from Big Sandy, on the road, who was also investigating the alarm. The deputy was driving north from Big Sandy, and he had not met any vehicles on the road until he stopped to talk to Roy Solberg. Solberg told the deputy that there were tire tracks going into and coming out of the Gabriel farm, and it appeared they were headed east toward Box Elder. Roy and the deputy then continued east until they met Erma Solberg.

Roy stopped Erma's vehicle, spoke briefly to her, and learned that as she had driven west from Box Elder, she had met only the blue and white pickup which was travelling quite fast. Erma also gave Roy the license number of the pickup. Roy relayed all this information to the deputy, who then turned around and drove east to find the pickup. Roy Solberg followed the deputy in his vehicle.

About one mile west of Box Elder, the deputy met the blue and white pickup, which was then travelling west at a normal rate of speed. The deputy turned around, turned on the overhead lights, and went after the pickup, which then increased its speed. The deputy pursued the pickup for approximately two miles. The pickup ultimately relented in the chase, although not before attempting to negotiate a 180 degree turn on the road. The deputy stopped his patrol car with the pickup a little ahead of and below him, but he did

not block the vehicle in. The deputy was not in uniform and was not carrying his service revolver. Consequently, upon leaving his car, the deputy removed a shotgun from the trunk of the patrol car and approached the pickup. Holding the shotgun in the "port" position, so that it was not pointed at the occupants of the pickup, the deputy identified himself, and ordered the occupants out of the truck. At this time, Roy Solberg arrived at the scene and immediately identified the property in plain sight in the bed of the truck as belonging to John Gabriel. The deputy then detained the suspects until an officer from the Hill County sheriff's department arrived to take the suspects into custody. John Gabriel thereafter viewed the contents of the pickup, consisting of various items of farm tools and equipment, and identified them as belonging to him.

At a hearing on defendants' motion to suppress all evidence obtained in the defendants' arrest, the deputy testified that although he did not tell the defendants that they were under arrest, he would not have allowed them to leave. He further testified that he did not know if the defendants' pickup was the vehicle that had entered the Gabriel farm, but that he had stopped it because it was the only vehicle in the area, he had a reasonable belief that the occupants were involved in an offense, and he thought the vehicle was trying to get away from him. The deputy also stated he would have stopped any vehicle, regardless of its color, make, or style, that was on the road that afternoon.

The District Court granted defendants' motion to suppress on June 10, 1981, concluding that the deputy did not have probable cause to stop the defendants' vehicle. In granting

-4-

the motion, the District Court relied on State v. Rader (1978), 177 Mont. 252, 581 P.2d 437, and State v. Lahr (1977), 172 Mont. 32, 560 P.2d 527.

On June 22, 1981, plaintiff filed a motion to reconsider the order of June 10, 1981. This motion was denied on July 2, 1981. Plaintiff filed another motion to reconsider on July 20, 1981, relying on State v. Gopher (1981), ___ Mont. ___, 631 P.2d 293, 38 St.Rep. 1078, which was decided on July 9, 1981. After a hearing on the motion, the District Court vacated its order dated June 10, 1981, which granted defendants' motion to suppress.

The District Court set out its reasons for vacating the motion to suppress in the following memorandum, dated October 7, 1981:

> "The Court has reviewed the evidence submitted at the hearing on the motion to suppress and the subsequent testimony of Peter O'Loughlin for the purpose of applying the criteria of State v. Gopher, 38 SR 1078. That case approved the stopping of a motor vehicle by a law enforcement officer when the stop is (1) by a trained police officer, (2) who has a particularized suspicion that an occupant of the vehicle, is or has been engaged in criminal activity, or witness thereto; and (3) is limited and reasonable.

> "At the time in question, Deputy Sheriff O'Loughlin had been a law enforcement officer for over 2 1/2 years. His experience with burglary investigations was limited, but he had worked several burglary cases. He had taken the basic training course of six weeks at the Montana Law Enforcement Academy, which included instruction on investigations and basis rules of evidence. While he might have been a comparative beginner in the law enforcement field, he sufficiently qualified as a trained police officer.

> "So far as the second factor is concerned, O'Loughlin possessed the following information: He was acquainted with the burglar alarm installation at the Gabriel farm and knew that neighbors were connected to it. He knew that the alarm had been set off on April 1, 1981, and responded to that alarm. He was aware that the Solbergs, neighbors of Gabriels, also had responded to the alarm as being genuine. He

was told by Roy Solberg that Roy had stopped at
the Gabriel place and Roy had observed fresh
tracks of motor vehicle tires in the Gabriel
yard and had followed those tracks east to the
point where he met O'Loughlin.  Deputy O'Loughlin
was acquainted with the area, knew that motor
traffic in the area was light and could be
observed for miles; that he and the Solbergs
had responded to the alarm within minutes; that
he had met no traffic as he approached from the
south and that Roy Solberg had met no traffic as
he approached from the west.  Further, he knew
that Erma Solberg, approaching from the east, had
seen no traffic except defendants' vehicle, and
that neither he nor the Solbergs had observed
any travel signs of other vehicles in the area.
Through Roy Solberg, he was provided with a
description of the defendants' vehicle and its
license number and with the information that it
had been traveling at a high rate of speed.  When
he started pursuing defendants' vehicle, it picked
up speed.  From this information, O'Loughlin had
reason to suspect that some criminal activity had
occurred at the Gabriel farm and that the occupants
of defendants' vehicle either were connected with
that activity or were witnesses to some circumstance
related to it.  His suspicions were particularized
to a specific activity and to a specific vehicle.

"The question remains whether the stop itself was
limited and reasonable.  The only argument defendants
make in this regard is that, when the stop was made,
O'Loughlin immediately produced a shotgun and ordered
defendants out of their vehicle.  He did not discharge
the shotgun either in effecting the stop or afterwards.
In view of the fact that he believed the vehicle had
been accelerated when he started the pursuit, and his
knowledge of the other circumstances, it was not
unreasonable for O'Loughlin to take precautions and
use the shotgun as he did.

"Almost immediately upon making the stop, O'Loughlin
discovered that defendants' vehicle was carrying
Gabriel property.  His stop was limited in time and
action to that which was necessary to detain defendants
until Hill County officers could take over.

"In the view of this Court, the stop of defendants'
vehicle in the rural area of Hill County under the
circumstances described met the criteria prescribed
by the Gopher case."

On December 1, 1981, a nonjury trial was held, and

Harvey and Melvin Morsette were convicted of burglary and

theft.  Harvey Morsette was sentenced to a 4 year prison

term on each count.  The terms were to be served concurrently

and the sentence was suspended.  Melvin Morsette was sentenced

-6-

to a term of 5 years on each count. The sentences were to run concurrently with the last two years of each sentence suspended.

Defendants present two issues for review:

1. Was the initial stop of defendants' vehicle justified on the basis of specific and articulable facts warranting a particularized suspicion that defendants were or had been engaged in criminal activity, or were witnesses thereto?

2. Was the stop of defendants' vehicle conducted in a reasonable manner; or was it overly intrusive, amounting, in fact to an arrest?

The test used to determine whether a stop is justified was set forth in State v. Gopher (1981), __ Mont. __, 631 P.2d 293, 38 St.Rep. 1078, wherein this Court stated, "When a trained police officer has a particularized suspicion that the occupant of a vehicle is or has been engaged in criminal activity, or witness thereto, a limited and reasonable investigatory stop and search is justified."

As stated in Gopher, an investigatory stop must be based on a "particularized suspicion" in order to be valid. This concept was set forth in United States v. Cortez (1981), 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621, wherein the Court held that objective facts and circumstantial evidence which indicate that a particular vehicle is involved in criminal activity will justify a brief investigatory stop. In determining what cause is sufficient to authorize police to stop a person, the Court indicated that "the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."

-7-

449 U.S. 417-418. The Court stressed that certainty is not essential. It stated that the process of assessing all of the circumstances does not deal with hard certainties, but with probabilities, and evidence collected must be weighed as understood by those versed in the field of law enforcement.

Based upon these concepts, the defendants contend that the investigatory stop was improper and unjustified because the deputy was unqualified as a trained law enforcement officer, and also because the stop was not based on specific, articulable, and objective facts, but rather on the deputy's speculations and hunches. We find no merit in these contentions. Sufficient facts were set forth in the District Court's memorandum of October 7, 1981, to justify the initial stop of the defendants' vehicle.

First, the District Court found that the deputy was sufficiently qualified as a trained law enforcement officer. This finding was based on the following factors: 1) the deputy had been a law enforcement officer for over 2 1/2 years; 2) he had worked on several burglary cases; and 3) he had taken the basic training courses at the Montana Law Enforcement Academy, which included instruction on investigations and basic rules of evidence. These factors, along with the fact that the deputy was familiar with the alarm system at the Gabriel farm, and had actually investigated an attempted burglary at the Gabriel farm on a prior occasion, illustrate that the deputy had the necessary qualifications as a trained law enforcement officer to make the initial stop of defendants' vehicle.

Second, the District Court cited the many facts which the deputy possessed which made his suspicions particularized

-8-

to a specific activity and to a specific vehicle. We comment with favor upon the manner in which the District Court set out the facts it relied upon to determine that the deputy possessed a particularized suspicion that the defendants were involved in criminal activity or were witnesses thereto. All these factors, which the deputy had knowledge of, gave him reason to believe that some type of criminal activity had occurred at the Gabriel farm, and that the defendants' vehicle may have been involved. Deputy O'Laughlin was not absolutely certain that the defendants' vehicle had been involved in the burglary, but a "particularized suspicion" does not require certainty on the part of the law enforcement officer. United States v. Cortez (1981), 449 U.S. 411, 418.

The defendants next contend that the conduct of the deputy in making the initial stop was not limited and reasonable, but was so intrusive that it amounted to an arrest. Defendants point particularly to the deputy's display of the shotgun when he stopped the defendants' vehicle. They also point to the fact that the deputy testified the defendants were not free to leave, and that he would have stopped them if they attempted to leave.

The United States Supreme Court has decided many cases which address the issue of the permissibility and scope of the investigatory stops. In Delaware v. Prouse (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660, the Court stated, "Stopping an automobile and detaining the occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention [is] quite brief." However, "what the constitution forbids is not all

-9-

searches and seizures, but unreasonable searches and seizures." Elkins v. United States (1960), 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669.

In Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Court noted that "there is no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." (Quoting Camera v. Municipal Court (1967), 387 U.S. 523, 534-535, 536-537.) The Court went on to note that the balancing test turns largely on the governmental interest which is claimed to justify the need for the search:

> "One [governmental interest] involved is of course that of effective crime prevention and detention; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. at 22.

We hold that the manner in which the deputy stopped the defendants' vehicle was justified and appropriate, and met the criteria of Terry.

The deputy's testimony that he would have attempted to prevent defendants from leaving if they had tried to do so does not constitute unreasonable behavior on his part. Although a stop which is lawful at the outset can become unlawful if it becomes overly intrusive, Kremen v. United States (1957), 353 U.S. 346, 77 S.Ct. 828, 1 L.Ed.2d 876, we do not find that to be the case here. The deputy's suspicions were founded on an apparently genuine burglar alarm, the information supplied by Roy and Erma Solberg, the elusive behavior of defendants' pickup while he was pursuing it, and the fact that the deputy saw farm equipment and

tools in the back of defendants' pickup when he made the stop. With these facts in mind, the deputy approached the vehicle and ordered the defendants to get out. At the time he did so, he had a reasonable suspicion that a crime had been committed and that the defendants may have been involved.

Defendants place too much emphasis on the deputy's use of the shotgun when he effectuated the stop. The deputy was not in uniform and was not carrying his service revolver. He approached the defendants' pickup holding the shotgun in the port position. He never pointed the shotgun at the defendants, and did not discharge the shotgun either in effecting the stop or afterwards. In addition, the deputy did not recognize two of the passengers in the pickup, and considered this to be a potentially dangerous situation. In light of these facts, Deputy O'Laughlin was fully justified in carrying a shotgun during the execution of the investigatory stop, for his own protection.

We hold that the initial stop of the defendants' vehicle was justified under the limitations established in Gopher. The stop itself was conducted in a reasonable manner and was limited to that which was necessary to effectuate the investigatory purposes of the stop.

The judgment of the District Court is affirmed.

John G. Shanley
                                    Justice

-11-

We Concur:

_John Conway Harrison_

_Daniel J. Shea_

_Jack C. Morris_

_____
Justices