No. 96-646

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997


STATE OF MONTANA,

Plaintiff and Respondent,

v.

JONATHAN COLLARD,

Defendant and Appellant.


APPEAL FROM:      District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Daniel P. Buckley, Berg, Lilly, Andriolo & Tollefsen, Bozeman,
Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Tammy K. Plubell, Assistant
Attorney General; Marty Lambert, Gallatin County Attorney, Jane Mersen,
Deputy Gallatin County Attorney, Bozeman, Montana


Submitted on Briefs: May 8, 1997

Decided:   December 18, 1997
Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

Jonathan Collard was charged in the District Court for the Eighteenth Judicial District, Gallatin County, with one count of robbery, a felony, and one count of criminal possession of dangerous drugs, a misdemeanor. After his pretrial motions to suppress physical evidence and his confession were denied, he pleaded guilty to both counts reserving his right to appeal the denial of his motions. We affirm.

We address the following issues on appeal:

1. Did the District Court err in concluding that Officer Megargel had a particularized suspicion to stop Collard?

2. Did the District Court err in denying Collard's motion to suppress physical evidence seized during a warrantless search?

3. Did the District Court err in denying Collard's motion to suppress his confession?

Factual and Procedural Background

In the early morning hours of November 29, 1995, the night clerk at Town Pump West in Bozeman reported a robbery. The clerk reported that the suspect was armed with a knife and that he had fled on foot. Officer Greg Megargel responded to the scene.

A few blocks from the Town Pump, Officer Megargel noticed a vehicle exiting a nearby trailer park "in a hurried manner." Officer Megargel testified that he thought this suspicious as it was the only vehicle moving about at that hour. As Officer Megargel caught up to the vehicle, he noticed that it had out-of-state plates so he requested that dispatch run a vehicle registration check.

Officer Megargel flashed his high beams on the vehicle to determine the number of occupants. He contends that just after he flashed his high beams, the vehicle turned a corner and pulled over to the side of the road unexpectedly. Collard, the driver of the vehicle, contends that he pulled over because he saw the yellow lights on top of the patrol car come on and he thought that the officer was signaling him to stop. Officer Megargel maintains that he had not turned his yellow top lights on or in any other way signaled Collard to pull over.

After Collard stopped, Officer Megargel pulled in behind him, got out of his patrol car and approached the vehicle. He noticed that Collard was sweating even though it was cold out, that he had splashes of mud on his sweatpants, and that his boots were wet. Officer Megargel asked Collard to step from the vehicle and then called dispatch for a confirmation of the description of the robber. The robber was described as wearing a blue sweatshirt, blue sweatpants, a bandana, ski goggles and black and white shoes. Collard was wearing an orange parka, white t-shirt, blue sweatpants, a blue hat, and two-toned brown Sorel boots.

Officer Megargel pat searched Collard for weapons. There is a dispute as to

how many pat searches were conducted prior to placing Collard under arrest. Nevertheless, during one of these pat searches, Officer Megargel felt an object in the leg of Collard's sweatpants that he determined to be a pair of ski goggles. Officer Megargel testified that he knew immediately that the object was ski goggles. He stated that he only had to touch the object for "a couple seconds" to recognize what it was. After discovering the ski goggles, Officer Megargel placed Collard under arrest.

Collard was transported to the Bozeman Police Department. During a tape recorded interview conducted by Detective Bill Dove, Collard was advised of his rights pursuant to Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. During this taped interview, Collard indicated that he understood his rights and, after signing a waiver of those rights, he confessed to committing the robbery.

After confessing to the robbery, Collard was taken to a field near the Town Pump where he claimed that he had dropped the knife that he used in the robbery. Officers searched the field but did not find the knife. Upon returning to the police station, Collard voluntarily filled out a handwritten confession before being taken to justice court for an initial appearance.

On December 11, 1995, Collard was charged with one count of robbery, a felony, in violation of õ 45-5-401, MCA, and one count of criminal possession of dangerous drugs, a misdemeanor, in violation of õ 45-9-102, MCA. He pleaded not guilty. The District Court originally set April 22, 1996, as the trial date, however, the matter was continued several times and trial was finally reset for August 14, 1996.

On August 9, 1996, Collard filed a motion to once again continue the trial date. This motion was subsequently denied by the District Court. On August 12, 1996, Collard filed combined motions to suppress physical evidence and his confession. He contended that the evidence was obtained from an illegal detention and search. He also contended that his confession was illegally obtained because prior to the taped interview in which he confessed, he was questioned without being advised of his Miranda rights.

On the day set for trial, the District Court allowed the State and Collard to voir dire and select the jury. The court then dismissed the jury for the day and conducted a hearing on Collard's motions to suppress. After considering the evidence and legal arguments presented at the hearing, the District Court entered findings of fact, conclusions of law and order denying Collard's motion to suppress physical evidence. The following day, Collard withdrew his not guilty plea and pleaded guilty to both counts, reserving his right to appeal the denial of his pre-trial motions. The jury

was dismissed without being sworn in.

The District Court's August 14, 1996 order did not specifically address Collard's motion to suppress his confession. Nevertheless, the court stated at the change of plea hearing on August 15, 1996, that it was denying the motion to suppress the confession on the grounds that Collard had waived his Miranda rights after full explanation.

On September 26, 1996, the District Court sentenced Collard to three years with the Department of Corrections on the robbery conviction and an additional three years with the Department of Corrections for the use of a weapon. The sentences were to run consecutively. The court also sentenced Collard to serve six months in the county jail on the criminal possession of dangerous drugs conviction. This latter sentence was to run concurrently to the other sentences.

Collard now appeals the District Court's order denying his motions to suppress his confession and physical evidence.

## Standard of Review

We review a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. State v. Siegal (Mont. 1997), 934 P.2d 176, 180, 54 St.Rep. 158, 160-61 (citing State v. Williams (1995), 273 Mont. 459, 462, 904 P.2d 1019, 1021; State v. Flack (1993), 260 Mont. 181, 188, 860 P.2d 89, 94).

## Issue 1.

Did the District Court err in concluding that Officer Megargel had a particularized suspicion to stop Collard?

Collard contended in his motion to suppress and now on appeal that he was illegally detained and all physical evidence resulting from the search based on that illegal detention must be suppressed. The District Court denied Collard's motion to suppress on the basis that the detention and subsequent search were proper as Officer Megargel had a particularized suspicion that Collard was involved in the robbery at the Town Pump.

Although warrantless searches are considered per se unreasonable under the Fourth Amendment of the United States Constitution, both federal and state law acknowledge certain specific exceptions to the warrant requirement. State v. McCarthy (1993), 258 Mont. 51, 55, 852 P.2d 111, 113 (citing Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; California v. Acevedo (1991), 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619). One such exception is the investigatory stop.

In 1968, the United States Supreme Court held that a law enforcement officer

may stop an individual to investigate possible criminal behavior even though there is no probable cause to make an arrest. Terry v. Ohio (1968), 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889. However, such an investigatory stop is only justified when it is based upon specific, articulable facts from which the officer could reasonably infer that the individual is engaged in criminal activity. Terry, 392 U.S. at 21, 88 S.Ct. at 1880.

Thirteen years later, in United States v. Cortez (1981), 449 U.S. 411, 101 S. Ct. 690, 66 L.Ed.2d 621, the Supreme Court provided further guidance to determine when an officer has sufficient grounds to make an investigatory stop. In Cortez, the Supreme Court stated that for an officer to make an investigatory stop, the officer must have a particularized suspicion, based upon objective data and the totality of the circumstances, from which an experienced officer can infer that the detained person is, has been or is about to be, engaged in wrongdoing. Cortez, 449 U.S. at 417-18, 101 S.Ct. at 695.

We adopted this standard in State v. Gopher (1981), 193 Mont. 189, 631 P.2d 293, and set forth a two-part test to determine whether sufficient particularized suspicion exists to justify an investigatory stop. We stated in Gopher that the State's burden has two elements: (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the person is, or has been, engaged in wrongdoing or was a witness to criminal activity. Gopher, 631 P.2d at 296.

The 1991 Legislature amended Montana's investigative stop statute to reflect the standard set forth in Gopher. This statute now provides:

Investigative stop. In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401, MCA (emphasis added). "[A] 'particularized suspicion' does not require certainty on the part of the law enforcement officer." State v. Morsette (1982), 201 Mont. 233, 241, 654 P.2d 503, 507 (citing Cortez, 449 U.S. at 418, 101 S.Ct. at 695). See also Rupp v. State, Department of Justice (1996), 279 Mont. 247, 251, 927 P.2d 1, 3 ("absolute certainty is not required"). Moreover, this Court has continually stated that whether a particularized suspicion exists is a question of fact which is dependent on the totality of the circumstances. State v. Broken Rope (1996), 278 Mont. 427, 431, 925 P.2d 1157, 1159 (citing Anderson v. State Dept. of Justice (1996), 275 Mont. 259, 263, 912 P.2d 212, 214; State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 542-43).

Collard contends that in this case, the investigatory stop was unjustified because Officer Megargel was not sufficiently qualified as a trained law enforcement officer since he had only been on the force for a short time.  In Morsette, we held that a deputy who had only been on the force a short time, but who had taken the basic training courses at the Montana Law Enforcement Academy and had worked on other burglary cases, was sufficiently qualified as a trained law enforcement officer to form a particularized suspicion as to the defendant in that case.  Morsette, 654 P.2d at 507.

Even though Officer Megargel had been on the Bozeman police force for only one year at the time of the robbery, he had attended the Montana Law Enforcement Academy and had spent three months in a field-training program.  In addition, Officer Megargel testified at the suppression hearing that he had been involved in other major crimes investigations before this incident.  Therefore, we hold that Officer Megargel was sufficiently qualified as a trained law enforcement officer to form a particularized suspicion and to make an investigatory stop of this nature.

Collard also contends that the investigatory stop was unjustified because it was not based on objective facts.  We disagree.  Officer Megargel's experience and training led him to believe that Collard may have been connected to the robbery at the Town Pump based on the following facts:  the knowledge that a crime had just been committed by a male acting alone; that Collard was first observed only a few blocks from the scene of that crime; that Collard's vehicle was the only vehicle observed moving about just after the crime had been committed; that Collard was the only person in the vehicle; that Collard was driving in "a hurried manner" away from the scene of the crime; and that Collard surprised Officer Megargel by pulling over unexpectedly.

While Collard contends that he was not moving in "a hurried manner" and that he pulled over because Officer Megargel signaled him to stop, the District Court found Officer Megargel's version more credible and concluded that he did have a particularized suspicion to stop Collard.  "The credibility of witnesses and the weight to be assigned to their testimony are to be determined by the trier of fact, and disputed questions of fact and credibility will not be disturbed on appeal."  State v. Moreno (1990), 241 Mont. 359, 361, 787 P.2d 334, 336 (citing State v. Green (1984), 212 Mont. 20, 23, 685 P.2d 370, 371-72).

Accordingly, based on the objective data and the totality of the circumstances, we hold that the District Court did not err in concluding that Officer Megargel had a particularized suspicion to stop Collard.

Issue 2.

Did the District Court err in denying Collard's motion to suppress physical evidence seized during a warrantless search?

Since we have already determined that Officer Megargel had a particularized suspicion that Collard may have committed an offense, it follows that, based on prior statutory and case law, Officer Megargel also had the authority to frisk Collard for weapons. The United States Supreme Court held in Terry that, in the course of investigating criminal behavior, if the officer has reason to believe that the individual may be armed and dangerous and nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, the officer, for his own protection and that of others in the area, is entitled to conduct "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Terry, 392 U.S. at 30, 88 S.Ct. at 1884-85.

In addition, Montana statutory law gives law enforcement officers the authority to frisk suspects under certain circumstances.

Stop and frisk. A peace officer who has lawfully stopped a person under 46-5-401 or this section:

(1) may frisk the person and take other reasonably necessary steps for protection if the officer has reasonable cause to suspect that the person is armed and presently dangerous to the officer or another person present;

. . .

Section 46-5-402, MCA.

Even so, Collard argues that there was no reasonable basis for Officer Megargel to frisk him for weapons as Officer Megargel had no reason to believe that Collard posed a threat. On the contrary, the clerk at the Town Pump had reported that the robber was armed with a knife. In addition, as Officer Megargel approached Collard's vehicle, he noticed that Collard was sweating, that he had splashes of mud on his sweatpants, and that his boots were wet. These observations, rather than serving to dispel his reasonable fear for his own or others' safety as pointed out in Terry, gave Officer Megargel reasonable cause to believe that Collard was the person who had just robbed the Town Pump and that he might be armed with a knife. On that basis, we hold that Officer Megargel was justified in conducting a pat search of Collard's person.

We next determine whether Officer Megargel exceeded the permissible scope of that search and whether the warrantless seizure of the ski goggles was proper. The State argues that the seizure of the ski goggles was justified under a corollary to the "plain view" doctrine known as the "plain feel" or "plain touch" doctrine and espoused by the United States Supreme Court in Minnesota v. Dickerson (1993), 508 U.S. 366, 375-76, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334. Although this Court has had occasion to

discuss Dickerson and the "plain feel" doctrine, State v. Stubbs (1995), 270 Mont. 364,
892 P.2d 547, overruled by State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, we did
not adopt that doctrine at that time as the facts in Stubbs warranted analysis under the
previously adopted "plain view" doctrine instead.  The facts in the instant case, however,
lend themselves more readily to an analysis under the "plain feel" doctrine and we take
this opportunity to evaluate this doctrine and its possible application.

We begin with a summary of the "plain view" doctrine.  Under the "plain view"
doctrine which this Court first adopted in State v. Gallagher (1973), 162 Mont. 155, 509
P.2d 852, and later modified in State v. Loh (1996), 275 Mont. 460, 914 P.2d 592, law
enforcement officers, under certain circumstances, may seize evidence in plain view
without a warrant.  Loh, 914 P.2d at 597.  Basing our decision in Loh on the United
States Supreme Court's decision in Horton v. California (1990), 496 U.S. 128, 110 S. Ct.
2301, 110 L.Ed.2d 112, we held that two conditions must be satisfied to justify a
warrantless seizure of incriminating evidence in plain view:

First, not only must the item be in plain view; its incriminating character
must also be "immediately apparent." . . . .  Second, not only must the
officer be lawfully located in a place from which the object can be plainly
seen, but he or she must also have a lawful right of access to the object
itself.

Loh, 914 P.2d at 598 (citing Horton, 496 U.S. at 136-37, 110 S.Ct. at 2308).  The idea
behind the "plain view" doctrine is that

[i]f an article is already in plain view, neither its observation nor its seizure
would involve any invasion of privacy.  A seizure of the article, however,
would obviously invade the owner's possessory interest.

Loh, 914 P.2d at 597 (citing Horton, 496 U.S. at 133-34, 110 S.Ct. at 2306).

In 1993, the United States Supreme Court, articulated the following corollary to
the "plain view" doctrine:

If a police officer lawfully pats down a suspect's outer clothing and feels
an object whose contour or mass makes its identity immediately apparent,
there has been no invasion of the suspect's privacy beyond that already
authorized by the officer's search for weapons; if the object is contraband,
its warrantless seizure would be justified by the same practical
considerations that inhere in the plain-view context.

Dickerson, 508 U.S. at 375-76, 113 S.Ct. at 2137.

In Dickerson, during a Terry stop and frisk, a  police officer felt a small lump in
defendant's jacket pocket.  After sliding his fingers over the lump and squeezing it, the
officer believed it to be crack cocaine wrapped in cellophane.  Thus, the officer reached

into defendant's pocket and retrieved the lump which proved to be a small plastic bag containing cocaine. Defendant moved the trial court to suppress this evidence. Dickerson, 508 U.S. at 368-69, 113 S.Ct. at 2133-34.

The Supreme Court determined in Dickerson that although the officer was lawfully in a position to feel the lump in defendant's pocket, the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was cocaine only by squeezing the object and otherwise manipulating it. Since the incriminating character of the object was not immediately apparent, the officer exceeded the permissible scope of a search under Terry. Hence, the Supreme Court held that this further search of defendant's pocket was constitutionally invalid and the seizure of the cocaine was unconstitutional. Dickerson, 508 U.S. at 379, 113 S.Ct. at 2139.

The reasons which led the Supreme Court to reject application of the "plain feel" or "plain touch" doctrine in Dickerson are not present in the case at bar, however. Rather, the facts of this case fit neatly within the elements of this doctrine as articulated by the Supreme Court and, thus, justify its adoption and application in upholding Officer Megargel's seizure of the ski goggles. Specifically, Officer Megargel properly engaged Collard in an investigatory stop based upon a particularized suspicion that Collard was involved in the Town Pump robbery; Officer Megargel then properly conducted a pat search for the knife that was reportedly used in the robbery; and, finally, in the conduct of this pat search, Officer Megargel felt an object whose contour or mass made it readily apparent that ski goggles, which the suspect was reportedly wearing were concealed on Collard's person.

Nevertheless, Collard contends that because Officer Megargel had to touch the ski goggles for a few seconds, their identity was not immediately apparent to him, hence they were wrongfully seized and should have been suppressed. However, the evidence does not show that Officer Megargel spent a considerable amount of time squeezing and manipulating the object as did the officer in Dickerson. On the contrary, Officer Megargel testified that he knew immediately that the object in the leg of Collard's sweat pants was a pair of ski goggles. He stated that he only had to touch the object "for a couple seconds" to recognize what it was. Moreover, unlike the lump of cocaine in the defendant's pocket in Dickerson, a pair of ski goggles has a shape that could be immediately identifiable when touched.

Accordingly, we hold that the District Court did not err in denying Collard's motion to suppress physical evidence seized during a warrantless search.

Issue 3.

Did the District Court err in denying Collard's motion to suppress his confession?

Section 46-13-301, MCA, allows a defendant to move to suppress a confession on the grounds that the defendant involuntarily gave the confession. The voluntariness of a confession is a factual question which must be decided based upon the totality of the circumstances. State v. Mayes (1992), 251 Mont. 358, 376, 825 P.2d 1196, 1208 (citing State v. Allies (1979), 186 Mont. 99, 111, 606 P.2d. 1043, 1050). The following factors are considered in determining the voluntariness of a confession: the defendant's age and level of education; the officer's interrogation technique; whether the officer advised the defendant of his of her Miranda rights; the defendant's prior experience with the criminal justice system; the defendant's general background and experience; and the defendant's demeanor, coherence, articulateness, and capacity to make full use of his or her faculties. State v. Loh (1996), 275 Mont. 460. 475-76, 914 P.2d 592, 601-02 (citing State v. Hermes (1995), 273 Mont. 446, 449-50, 904 P.2d 587, 589; State v. Shaver (1988), 233 Mont. 438, 444, 760 P.2d 1230, 1233).

Taking these factors in order and analyzing them to the facts in the case before us demonstrates that Collard's confession was made voluntarily. First, Collard was twenty years old at the time of the robbery and had attended at least one semester of college. Second, a review of the transcript of the taped interview shows that Detective Dove's interrogation technique was a simple question-and-answer format. His demeanor does not appear to be coercive or threatening in any way. Third, the transcript shows that Detective Dove did advise Collard of his Miranda rights. Fourth, Collard apparently had some experience with the criminal justice system as the evidence showed that he previously had been fined by a court for some other misdeed. In addition, when he was stopped by Officer Megargel, Collard allowed Officer Megargel to look under a shirt on the passenger seat. However, Collard told Officer Megargel that "you can't search anywhere else because I know my rights." Lastly, Collard's answers to Detective Dove's questions and the questions Collard asked about the charges against him, show that Collard was coherent, articulate, and in full use of his faculties when he confessed to the robbery.

Since Collard's confession was clearly voluntary, his only means of having the

confession suppressed is to claim that prior to the taped interview in which he was advised of his Miranda rights, an unrecorded, un-Mirandized interview took place. Collard contends that this pre-interview occurred when Detective Dove took Collard to another room for a cigarette break. Thus, Collard argues that the taped interview in which he confessed to the robbery and his subsequent written confession are inadmissible as they are fruits of this first unrecorded, un-Mirandized interview.

At the hearing on Collard's motion to suppress, Detective Dove unequivocally and repeatedly denied that there had been any pre-interview. He testified that Collard either þdoesnþt recall correctly or he is lyingþ because the cigarette break occurred after the taped interview in which Collard was advised of his Miranda rights and not before.

Contrary to Collard's allegations, there is no evidence that an un-Mirandized, unrecorded interview occurred between Collard and Detective Dove other than Collard's contentions that statements made by Detective Dove during the taped interview prove that there was a prior interview. To that end, Collard points out that Detective Dove, during the taped interview, stated: "Once we start getting into some of these questions again . . . ." Collard contends that, by this statement, Detective Dove was referring to questions he asked during the pre-interview. However, Detective Dove testified that when he made that statement, he was referring to a point earlier in the taped interview when he mentioned to Collard what types of questions he would be asking.

A review of the transcript of the taped interview shows that Detective Dove did indeed mention in the initial portion of the interview some of the questions he wanted to ask Collard. For example, after reading Collard his rights, Detective Dove stated : "You don't have to explain any of the questions we have such as, you know, what in the world were you doing trying to pay off fines, trying to buy a ski pass or just trying to buy some party money." A few moments later, but prior to the statement about questioning "again," Detective Dove stated that "the biggest questions, like I say is why? You trying to pay off the court fines up here in the jail or what's going on. If you acted alone, if there was somebody else you were going to pick up . . . ."

Collard also argues that Detective Dove's knowledge of the fact that Collard had court fines to pay shows there was a prior conversation. To the contrary, Detective Dove pointed out at the suppression hearing that, prior to interviewing Collard, he had run a criminal history check on Collard and found that he had an outstanding warrant.

We have repeatedly stated that it is within the province of the trial court to

determine the credibility of the witnesses and the weight to be given their testimony during a hearing on a motion to suppress and we do not review those determinations. State v. Campbell (1996), 278 Mont. 236, 241, 924 P.2d 1304, 1307 (citing State v. Gould (1985), 216 Mont. 455, 466, 704 P.2d 20, 27-28; State v. Grimestad (1979), 183 Mont. 29, 36-37, 598 P.2d 198, 203). Here, the District Court clearly found Detective Dove to be the more credible witness and we will not disturb that determination.

Detective Dove did exactly what we have been encouraging law enforcement officers to do for a number of years, tape record or create an audio-visual record of Miranda warnings and the detainee's waiver of his or her rights. See State v. Grey (1995), 274 Mont. 206, 907 P.2d 951; State v. Cassell (1996), 280 Mont. 397, 932 P.2d 478. We held in Grey and in Cassell that, although we would not require that an interview be tape recorded, a law enforcement officer's failure to preserve some tangible record of giving a Miranda warning, along with the detainee's knowing and intelligent waiver of his or her rights, would be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission. Grey, 907 P.2d at 955-56. Here, Detective Dove is deserving of credit for having tape recorded the interview with Collard wherein he advised Collard of his Miranda rights.

Accordingly, we hold that the District Court did not err in denying Collard's motion to suppress his confession.

Affirmed.

/S/ JAMES C. NELSON


We Concur:

/S/ J. A. TURNAGE
/S/ JIM REGNIER
/S/ WILLIAM E. HUNT, SR.
/S/ KARLA M. GRAY