No. 02-468

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 90

IN THE MATTER OF D.R.B., A Youth,

　　　　Appellant.

APPEAL FROM:　　District Court of the Thirteenth Judicial District,
　　　　　　　　　　In and for the County of Yellowstone, DJ 01-089
　　　　　　　　　　The Honorable G. Todd Baugh, Judge presiding.

COUNSEL OF RECORD:

　　　　For Appellant:

　　　　Betty Carlson, Deputy Public Defender, Billings, Montana

　　　　For Respondent:

　　　　Hon. Mike McGrath, Montana Attorney General, John Paulson, Assistant
　　　　Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County
　　　　Attorney, J. Mark Angelus, Deputy County Attorney, Billings, Montana

Submitted on Briefs:　April 6, 2004

Decided:　April 7, 2004

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1    D.R.B. appeals the judgment of the Thirteenth Judicial District Court, Yellowstone County, denying his motion to suppress evidence Officer Kathy Carson (Officer Carson) found on his person.

¶2    We address the following issues on appeal and affirm:

¶3    1.    Was Officer Carson's investigative stop of D.R.B. supported by particularized suspicion?

¶4    2.    Did Officer Carson exceed the scope of the investigative stop?

¶5    3.    Did Officer Carson have reasonable cause to conduct a frisk of D.R.B.?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    At approximately 11:00 p.m., on March 31, 2001, Officer Carson of the Billings Police Department was on patrol in her police vehicle when she observed a young person behind a vehicle.

¶7    She presumed this person was removing the license plate from that vehicle, which was parked near a residence.  Thinking this person was in the process of stealing the license plate from that vehicle, Officer Carson stopped her police vehicle and made contact with the youth.

¶8    At that point, she recognized the youth as D.R.B., with whom she had come in contact five or six times during her law enforcement career.  From her previous contacts, Officer Carson knew that the youth did not reside at the nearby residence and that the youth did not own a vehicle.  Officer Carson asked D.R.B. what he was doing, and D.R.B. replied that he

2

was putting a license plate on the vehicle.

¶9    However, due to the time of night and the fact that Officer Carson knew that D.R.B. did not reside at the nearby residence, nor did he even own a vehicle, Officer Carson believed that D.R.B. might have a weapon on his person. Officer Carson then conducted a pat-down search. While conducting this pat-down search, Officer Carson felt a hard metal object. Believing the object could be a knife, Officer Carson removed the object from D.R.B.'s pocket. The hard metal object turned out to be a marijuana pipe.

¶10   At about the same time Officer Carson was conducting the pat-down search, D.R.B.'s girlfriend came out of the residence and told Officer Carson that she had asked D.R.B. to put her license plate on the vehicle.

¶11   D.R.B. filed a motion to suppress the drug paraphernalia evidence obtained from his person, arguing that Officer Carson did not have particularized suspicion for the investigative stop.

¶12   Following a suppression hearing, the District Court denied D.R.B.'s motion to suppress. D.R.B. then filed a motion and brief to reconsider the denial of his motion to suppress. The District Court denied this motion as well, after which D.R.B. changed his plea, reserving his right to appeal the District Court's denial of his motion to suppress.

¶13   The District Court adjudicated D.R.B. to be delinquent and entered a disposition order. D.R.B. was given credit for time served and released.

¶14   D.R.B. now appeals the District Court's denial of his motion to suppress.

**STANDARD OF REVIEW**

3

¶15    We review a district court's findings of fact to determine whether they are clearly erroneous. *State v. Logan*, 2002 MT 206, ¶ 12, 311 Mont. 239, ¶ 12, 53 P.3d 1285, ¶ 12. We review a district court's conclusions of law for correctness. *Logan*, ¶ 12. Because the facts here are undisputed, our review is limited to whether the District Court's application and interpretation of the law was correct.

## DISCUSSION

¶16    **1.    Was Officer Carson's investigative stop of D.R.B. supported by particularized suspicion?**

¶17    D.R.B. argues that Officer Carson did not have particularized suspicion in stopping him. Specifically, D.R.B. argues that "[r]eplacing a license plate at eleven o'clock at night in baggy clothes is no more suspicious than tooling around in the garage preparing for a duck hunt in camouflage long-underwear, or repairing an engine of a vehicle wearing dark, greasy overalls." Under the totality of circumstances, D.R.B. argues that Officer Carson did not have particularized suspicion because: (1) she only observed D.R.B. working behind a vehicle, albeit late at night; (2) she was not responding to a report of suspicious activity; and (3) D.R.B. "did not try to hide, run, move furtively, or stare suspiciously" upon Officer Carson's approach and resultant questioning.

¶18    The State argues that D.R.B.'s conduct was "inherently suspicious," given that Officer Carson observed D.R.B. behind a vehicle at eleven o'clock at night, she knew that D.R.B. did not reside at the residence where the vehicle was parked, and she knew that D.R.B. did not own a vehicle. Thus, in totality, the State argues that Officer Carson had

4

particularized suspicion to believe that D.R.B. was engaged in the theft of a license plate.

¶19 Section 46-5-401, MCA, states that:

> [i]n order to obtain or verify an account of the person's . . . conduct . . . a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

¶20 The above-quoted statute codifies a two-part test we adopted in *State v. Gopher* (1981), 193 Mont. 189, 631 P.2d 293, regarding the existence of particularized suspicion. Under this two-part test, for an officer to have particularized suspicion, there must exist (1) objective data from which the officer can make certain inferences; and (2) a resulting suspicion that the person is engaged in wrongdoing. *Gopher*, 193 Mont. at 194, 631 P.2d at 296. Hence, based on an officer's training, that officer can draw the necessary inferences and make the necessary deductions that "might well elude an untrained person" when determining whether a person is engaged in wrongdoing. *Gopher*, 193 Mont. at 192, 631 P.2d at 295 (quoting *United States v. Cortez* (1981), 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629). In addition, an officer need not be certain an offense is being committed or has been committed before initiating a valid investigative stop. *State v. Morsette* (1982), 201 Mont. 233, 241, 654 P.2d 503, 507.

¶21 Here, during her patrol, Officer Carson observed a young person behind a vehicle at eleven o'clock at night. Given the time of night and the fact that a young person was involved, Officer Carson presumed the young person was stealing the license plate, so she stopped her vehicle and made contact with the youth. At that point, Officer Carson

5

recognized the youth as D.R.B. She knew that D.R.B. did not reside at the residence where the car was parked and she knew that D.R.B. did not own a vehicle.

¶22    We hold that Officer Carson had objective data--viewing a young person behind a vehicle at eleven o'clock at night--from which to make an inference that the youth was stealing the license plate. Most individuals do not work on their license plates at eleven o'clock at night. Further, we hold that based on the objective data that Officer Carson observed, a suspicion that the youth was involved in wrongdoing resulted, especially given that upon confronting the youth, Officer Carson recognized the youth as D.R.B. and knew that he did not reside at that residence nor did he even own a vehicle.

¶23    Therefore, we hold that Officer Carson had particularized suspicion to support her investigative stop of D.R.B.

¶24    **2.      Did Officer Carson exceed the scope of the investigative stop?**

¶25    D.R.B. argues that Officer Carson exceeded the scope of her investigatory stop because after she initiated her stop "her initial suspicion for which the 'stop was predicated' was quashed" by D.R.B.'s "reasonable explanation" regarding what he was doing behind the vehicle. Hence, D.R.B. argues that "Officer Carson was no longer within the legal limits of her authority," given that he "provided no other reason for her to suspect anything more. . . ."

¶26    The State argues that Officer Carson did not exceed the scope of her investigatory stop.  Specifically, the State argues that once Officer Carson discovered that the young person who was acting suspiciously was D.R.B., it was reasonable for her to investigate further because:  (1) she knew that D.R.B. did not live at the residence where the vehicle was parked and (2) she knew that D.R.B. did not own a vehicle.  Hence, Officer Carson had probable cause to believe D.R.B. had committed an offense and the "brief pat-down search for weapons in order to assure her safety as she continued the investigation" did not exceed the scope of her investigative stop.

¶27    According to § 46-5-403, MCA, an investigative stop "may not last longer than is necessary to effectuate the purpose of the stop."  However, an investigative stop "may become further prolonged and the scope [of that investigative stop] enlarged as required by the circumstances," so long as "the scope of the investigation remains within the limits created by the facts upon which the [investigative] stop is predicated and the suspicion which they arouse."  *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 40, 289 Mont. 1, ¶ 40, 961 P.2d 75, ¶ 40 (citations omitted).

¶28    Here, upon confronting the youth regarding why he was working behind a vehicle at eleven o'clock at night, Officer Carson recognized the youth as D.R.B.  At that point, she knew that he did not reside at the residence where the vehicle was parked and she knew that he did not own a vehicle.  On these facts, Officer Carson's suspicions of D.R.B. were heightened, and we hold that Officer Carson's pat-down of him remained within the context of her initial investigative stop, namely that a young person was stealing a license plate.

7

¶29    Therefore, we hold that Officer Carson did not exceed the scope of her investigative stop in performing a pat-down search for weapons of D.R.B.

¶30    **3.      Did Officer Carson have reasonable cause to conduct a frisk of D.R.B.?**

¶31    D.R.B. argues that Officer Carson did not have reasonable cause to conduct a frisk of him because she only observed a young person working behind a vehicle at night in front of a residence and "mistakenly assumed" that this young person was stealing a license plate. Such a "hunch," D.R.B. argues, cannot satisfy the "reasonable prudent man" standard to establish the reasonable cause necessary to conduct a stop and frisk, especially given that Officer Carson conducted the frisk as part of a "standard procedure."

¶32    The State argues that because Officer Carson knew that D.R.B. did not live at the residence where the vehicle was parked and that he did not own a vehicle, she was afraid that he might have a weapon hiding in his baggy clothes. Hence, the State argues that it was not unreasonable for Officer Carson, in confronting D.R.B. at night under those circumstances, to conduct a weapons frisk out of concern for her safety.

¶33    For a stop and frisk to be valid at its inception, two criteria must be met. First, "the State must . . . establish objective data from which an experienced officer can make certain inferences." Second, there must exist a resulting suspicion that the person was engaged in wrongdoing. *State v. Dawson*, 1999 MT 171, ¶ 17, 295 Mont. 212, ¶ 17, 983 P.2d 916, ¶ 17 (officer had reasonable cause to stop and frisk the defendant where the officer did not have prior dealings with the defendant and, therefore, was unaware of whether the defendant posed a threat); *State v. Collard* (1997), 286 Mont. 185, 191, 951 P.2d 56, 60-61 (officer had

8

reasonable cause to believe that the defendant was the robber and might be armed where the officer observed that the defendant was sweating, had mud splashes on his pants, and was wearing wet boots).

¶34 The District Court determined that based on Officer Carson's testimony, it was not standard procedure to frisk all citizens during an investigative stop. Rather, it was standard procedure to frisk citizens in circumstances that gave rise to a reasonable cause for concern regarding the officer's safety. We agree.

¶35 Here, unlike the officer in *Dawson*, Officer Carson had prior dealings with D.R.B. However, it was based on these prior dealings that she had reasonable cause for concern regarding her safety because she knew that D.R.B. neither resided at that residence nor owned a vehicle. Hence, this knowledge, like the knowledge that the officer in *Collard* gained through observation of the defendant, gave her reasonable cause to believe that D.R.B. was committing an offense and might be armed. She did not have to accept D.R.B.'s seemingly innocent explanation of why he was working behind the vehicle at eleven o'clock at night.

¶36 Therefore, we hold that Officer Carson had reasonable cause to conduct a frisk of D.R.B.

¶37    Affirmed.


/S/ JAMES C. NELSON


We Concur:

/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JIM RICE

Chief Justice Karla M. Gray, concurring in part and dissenting in part.

¶38     I concur in the Court's decision on Issue 1.  I respectfully dissent from the Court's opinion on Issues 2 and 3.

¶39     Issue 2 is whether Officer Carson exceeded the scope of the investigative stop. The Court properly observes that D.R.B.'s argument relates to the length of the stop.  According to D.R.B., the scope of the stop was exceeded at the moment after D.R.B. offered a reasonable explanation for his presence behind the vehicle.  This argument simply has no merit, and is not supported by any of the cases on which D.R.B. relies.  If the Court resolved this issue on that basis, I would join in the opinion and affirm on this issue.

¶40     Instead of doing so, however, the Court moves past the argument presented on this issue and drifts into a discussion and resolution of a different issue; namely, whether the pat-down search was reasonable or supported by probable cause.  It includes therein a statement that Officer Carson had probable cause to believe D.R.B. had committed an offense and the pat-down did not exceed the scope of the investigative stop.  As part of its discussion, the Court relies on *Hulse*.  While I agree with the principles the Court advances from that case, it is my view they have no application here.

¶41     *Hulse* involved a stop for possible DUI and the issue of whether particularized suspicion for the stop would serve as particularized suspicion for administering field sobriety tests.  We properly determined that it would.  *Hulse*, ¶ 39.  We went on, in ¶ 40 as cited by the Court here, to recognize that investigative stops can take on the quality of an escalating

11

situation and stated, as does the Court here, the stop properly may be prolonged and its scope enlarged as post-stop circumstances might warrant. In *Hulse*, the purpose of the stop was to determine whether the driver was impaired by alcohol; the field sobriety tests are a logical and nearly inevitable extension of the stop. Nothing in the present case establishes an escalating situation or post-stop circumstances which would, in and of themselves, provide a basis for a frisk or pat-down. Officer Carson believed the youth was stealing license plates from the vehicle and made the stop on that basis. There was neither an escalating situation nor post-stop circumstances which necessitated anything outside the scope of investigating the possible theft.

¶42     In any event, it strikes me that the Court simply confuses matters in Issue 2 by going beyond the argument presented by D.R.B. on this issue and addressing, at least in part, the separate question contained in Issue 3. I would restrict the analysis to the argument D.R.B. advances and, on that basis, determine that the officer did not exceed the scope of the investigative stop.

¶43     With regard to Issue 3, the specific issue of whether Officer Carson had reasonable cause to conduct a frisk or pat-down of D.R.B., I dissent from the Court's analysis and result; I would reverse. The essence of the Court's opinion is that the possibility of a theft of a minor nature, occurring at 11:00 at night by a young person wearing baggy clothes, is sufficient cause for a law enforcement officer to pat-down a suspect for weapons. On the facts of this case, I totally disagree.

¶44     The Court addresses this issue under the two criteria which apply "[f]or a stop and

12

frisk to be valid at its inception." The criteria stated, however, are those used to determine whether particularized suspicion exists for the stop. We addressed that question, under those criteria, in Issue 1 in the present case and concluded that sufficient particularized suspicion supported Officer Carson's initial stop. We also addressed the particularized suspicion issue in *Dawson*, ¶¶ 17-19, and in *Collard*, 286 Mont. at 191-93, 951 P.2d at 60-61.

¶45     What the Court seems to miss here is that the frisk or pat-down issue is a separate question under both *Dawson* and *Collard*. In *Dawson*, the discussion of that issue begins at ¶ 21, after our conclusion on the particularized suspicion issue; in *Collard*, it is a separate issue. 286 Mont. at 193-94, 951 P.2d at 61-62. Both *Dawson* and *Collard* rely on § 46-5-402, MCA (2001) (repealed 2003), which provides that following a lawful stop, a peace officer may frisk the person "if the officer has reasonable cause to suspect that the person is armed and presently dangerous to the officer or another person present." Under the principles and statute set forth in *Dawson* and *Collard*, it is my view that Officer Carson was not authorized to frisk D.R.B. for weapons in this case.

¶46     *Dawson* involved the execution of a search warrant for a motel room based on the suspicion that it was being used for illegal activities involving stolen merchandise, bad checks and drugs. *Dawson*, ¶ 5. The facts which supported the frisk in *Dawson* involved a law enforcement officer's testimony that--in his experience--people involved with illegal drugs are more likely to carry weapons and that, in  assisting other officers in the execution of a search warrant just a month prior, a person entered the premises and pulled a knife on the officers. *Dawson*, ¶ 23. On those facts, there could be little doubt that the officers had

13

reasonable cause to suspect that the person was armed and presently dangerous. Those facts are a far cry from a kid in baggy pants appearing to be stealing a license plate at 11:00 at night.

¶47 In *Collard*, a robbery occurred in the early morning hours at a convenience store. The clerk reported the perpetrator was armed with a knife and had fled on foot. The responding officer noticed a vehicle a few blocks away exiting a trailer park hurriedly; the vehicle had out-of-state license plates and was the only vehicle moving about in the area. After stopping and approaching the vehicle, the officer noticed the defendant was sweating-- notwithstanding the cold--and had mud on his sweatpants and wet boots. The officer frisked him. *Collard*, 286 Mont. at 188-89, 951 P.2d at 58-59. On appeal, we determined that these facts gave the officer reasonable cause to believe that the defendant was the person who had just robbed the store and that he might be armed with a knife. Under such circumstances, we held a pat-down search was justified by reasonable fears for the safety of the officer or others. Again, these facts are a far cry from those before us in the present case.

¶48 Here, Officer Carson testified that D.R.B. did not smell of marijuana, slur his words or appear unsteady. He did not try to run or hide. Officer Carson had had contacts with D.R.B. before, but did not articulate any concern for her safety based on those contacts; indeed, when asked by the trial court whether her thought that he might have a weapon was based on her prior contacts with D.R.B., Officer Carson candidly responded "[n]o, not necessarily, sir." Thereafter, she twice testified that it was her "standard procedure" to pat people down for weapons; "it's just something I do." With regard to the baggy clothing, the

14

officer stated they made it "hard to tell whether he had any weapons on him."

¶49    It is my view that these facts do not come anywhere near constituting "reasonable cause to suspect that the person is armed and presently dangerous."  While officers must protect themselves, I do not think they are--or need be--threatened by every teenager out at 11:00 at night in baggy clothes doing something that appears to constitute a minor offense. Are officers really feeling threatened, for example, by baggy-clothed youths out skateboarding at 11:00 p.m. on property posted against skateboarding?  Do we really think searches for weapons are justified in those, or these, circumstances?  The Court apparently does; I do not.

¶50    Aside from the issues before us, one of my major concerns about this case is something the Court never addresses.  The Court correctly states that the District Court denied D.R.B.'s motion to suppress and his motion to reconsider its denial of the original motion.  The Court never discusses the District Court's statements about this issue and I believe it is important to do so.  The District Court first recognized that the statutory test is reasonable cause to suspect the person is armed and dangerous and stated "I don't know if the officer had any particularized suspicion."  The trial court went on, however, to repeat several times that "the standard operating procedure to frisk somebody for officer safety certainly seems reasonable to this Court."  The District Court ultimately opined that it "[s]ounds perfectly reasonable to this Court for an officer to frisk a person they have stopped, because you just don't know."  For these reasons, the trial court determined that "I think we'd have to go on what the officer perceived as reasonable at the time and place, and

15

her actions seem reasonable to me."

¶51 I have no quarrel with a person having a personal view that differs from what the law requires. I have enormous concerns about any judge who, believing that an officer should be able to frisk every person stopped, bases his or her legal judgment on that belief which is so contrary to the law.

¶52 I join the Court on Issue 1, would affirm on Issue 2 on entirely different grounds, and would reverse on Issue 3.

/S/ KARLA M. GRAY

Justice W. William Leaphart and Justice Jim Regnier join in the foregoing dissenting and concurring opinion.

/S/ W. WILLIAM LEAPHART
/S/ JIM REGNIER

16