**Alice BROWN, Plaintiff,**

v.

**State of MONTANA; Department of Public Health and Human Services Child and Family Services Division; Shawn Wills, Defendants.**

**No. CV 05–73–GF–SEH.**

United States District Court,
D. Montana,
Great Falls Division.

June 12, 2006.

Alice Brown, Talent, OR, pro se.

Thomas G. Bowe, Montana Department of Justice, Helena, MT, Defendant.

## ORDER

HADDON, District Judge.

### BACKGROUND

On October 31, 2006, Defendants filed a Motion for Summary Judgement. United States Magistrate Judge Carolyn S. Ostby entered her Findings and Recommendation[1] on April 14, 2006. Plaintiff filed objections on May 1, 2006. On that same day, Plaintiff filed a Motion to Vacate Findings and Recommendation of U.S. Magistrate Judge and a Motion to Vacate Order. The Court reviews *de novo* findings and recommendation to which objection is made. 28 U.S.C. § 636(b)(1).

### DISCUSSION

Judge Ostby found that the Eleventh Amendment bars Plaintiff from proceeding

---

1. Docket No. 12.

in federal court with claims for money damages against Defendants State of Montana, the Department of Public Health and Human Services, the Child and Family Services Division, and Shawn Wills in her official capacity. Judge Ostby also found that Defendant Shawn Wills is not entitled to qualified immunity. Judge Ostby recommended that Defendants' Motion for Summary Judgment be granted as to Plaintiff's claims for money damages against Defendants State of Montana, the Department of Public Health and Human Services, the Child and family Services Division, and Shawn Wills in her official capacity, but denied as to Shawn Wills in her individual capacity.

■ Plaintiff objects to Judge Ostby's Findings and Recommendation because "[she] did not and [does] not consent to the Magistrate Judge's exercise of jurisdiction over this case." Plaintiff's Objection at 1 (May 1, 2006). Plaintiff attached a copy of her Consent to the Exercise of Jurisdiction by a United States Magistrate Judge form to her motion, which indicates that Plaintiff did not consent to full jurisdiction by Judge Ostby. Plaintiff also moves the Court to "vacate" Judge Osby's Findings and Recommendation based upon the same argument set forth in her objections.

Section 636(b)(1)(B) of Title 28 of the United States Code provides, in relevant part:

[A] judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action.

However, Section 636(b)(1)(C) of Title 28 of the United States Code provides, in relevant part:

[A] judge may ... designate a magistrate judge to ... submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A).

Here, the Court, on April 26, 2006, in the absence of written consent by Plaintiff to full jurisdiction by the United States Magistrate Judge, reassigned the case to this Court and subsequently referred it to Judge Ostby as authorized by 28 U.S.C. § 636. The Court finds that Plaintiff's objection is without merit and her motion to vacate should be DENIED. *See also* L.R. 73.1(b) ("Any active Article III judge may designate a United States Magistrate Judge to exercise jurisdiction over any other civil case in accordance with 28 U.S.C. § 636 and Chapter IV of these Rules."). Accordingly, after *de novo* review of the record, I adopt in full the Findings and Recommendation of Judge Ostby.

Plaintiff also moves the Court to vacate the scheduling order entered by Judge Ostby on April 11, 2006, based upon her objection to full jurisdiction by Judge Ostby. However, for the reasons set forth above, Plaintiff's Motion to Vacate should also be denied.

ORDERED:

Plaintiff's Motion for Summary Judgement[2] is GRANTED in part and DENIED in part as follows:

1. Defendants State of Montana, the Department of Public Health and Human Services, and the Child and family Ser-

---

**2.** Docket No. 7.

vices Division are DISMISSED with prejudice.

2. Shawn Wills, in her official capacity, is DISMISSED with prejudice.

FURTHER ORDERED:

1. Plaintiff's Motion to Vacate Findings and Recommendations of U.S. Magistrate Judge [3] is DENIED.

2. Plaintiff's Motion to Vacate Order [4] is DENIED.

## FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE

OSTBY, United States Magistrate Judge.

On July 28, 2005, Plaintiff Alice Brown filed this action alleging that her constitutional rights were violated when her newborn son was removed from her care for a period of twelve days immediately following his birth.[1] Brown is proceeding *pro se.*

On October 31, 2005, Defendants filed an Answer and a motion for summary judgment. Brown responded on November 17, 2005, at which time she also filed a motion to set a jury trial. Defendants responded to Brown's motion and filed their reply on November 28, 2005.

### I. Allegations of Brown's Complaint

Brown contends that, on July 28, 2003, Defendant Wills, a social worker for the Child and Family Services Division of Montana's Department of Public Health and Human Services, entered Brown's hospital room in Great Falls with two armed police officers. Wills told Brown that Brown's newborn son was being taken into custody and Brown would not be permitted to hold him, touch him, or see him. Wills gave Brown a document titled "Notification to Parent." The Notification listed "Open Case in Alaska—Case seeking termination findings" and "Physical Limitations that may lead to physical Neglect" as reasons for the child's removal. *See* "Notification," attached to Compl. When Brown inquired as to the meaning of the second reason, Wills told her that a nurse had reported that Brown was unable to hold her newborn baby boy for longer than ten minutes because she was obese. Brown demanded "an opportunity to disprove the allegation by holding my baby in my arms for as many hours as it takes to prove that I can hold my baby for longer than ten minutes." Compl. (Court's doc. 1) at 4. Wills did not investigate the allegation or ask Brown any questions. Brown says she was also informed that the "open case in Alaska" did not pertain to her newborn son. *Id.* at 3–4.

On August 8, 2003, the Honorable Julie Macek of Montana's Eighth Judicial District Court ordered the immediate return of Brown's child. Judge Macek found that there was not sufficient evidence to substantiate Brown's abuse or neglect of the infant or a risk of future abuse or neglect. *Id.* at 6–7.

Brown alleges that Wills violated the Fourth Amendment by taking the child "without a court order, search warrant, probable cause, emergency need, or my consent." She also alleges violations of the Due Process Clause of the Fifth and

---

**3.** Docket No. 26.

**4.** Docket No. 25.

**1.** D. Mont. L.R. 1.8(a)(2) provides that "If the involvement of a minor child must be mentioned, only the initials of that child shall be used." The parties are advised that their filings and exhibits must continue to comply with this rule. The parties should file redacted versions of documents containing information protected under the Rule and simultaneously file an unredacted document under seal. *See* D. Mont. L.R. 1.8(c).

Fourteenth Amendments, Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d et seq., various provisions of Title 18 of the United States Code, and 2 U.S.C. § 1311. *Id.* at 5–6.

For her relief, Brown requests $400.00 in compensatory damages and $4,000,000.00 in punitive damages.[2]

## II. Summary Judgment Standards

A party is entitled to summary judgment if that party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©. A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The non-moving party may do this by use of affidavits (including her own), depositions, answers to interrogatories, and admissions. Only disputes over facts that might affect the outcome of the suit under the governing law are "material" and will properly preclude entry of summary judgment. *Id.*

At the summary judgment stage, the judge's function is not to weigh the evidence or determine the truth of the matter, but to determine whether there is a genuine issue for trial. However, if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505.

■ In civil rights cases and in the context of a motion for summary judgment where a litigant is proceeding *pro se,* the Court must construe the pleadings liberally and afford the *pro se* litigant the benefit of any doubt. *Baker v. McNeil Island Corrections Ctr.,* 859 F.2d 124, 127 (9th Cir.1988).

## III. Analysis

The Defendants argue that they are entitled to immunity from suit on various grounds.

**2.** Defendants correctly point out, *see* Answer (Court's doc. 6) at 4, that the 10,000:1 ratio between the punitive and compensatory damages requested by Brown is questionable. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). "Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," *id.* at 416, 123 S.Ct. 1513 (internal quotation marks omitted), including, in this context, the value of the constitutional right allegedly violated, emotional distress, and the like, as well as expenses incurred as a result of the defendant's conduct. "By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution." *Id.* Although it declined to announce a bright-line rule, the *Campbell* Court opined that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513. However, because a detailed consideration of the evidence is required, this is not the sort of issue that can be addressed at the outset of a case.

## A. Eleventh Amendment Immunity

Defendants argue that the State of Montana, the Department of Public Health and Human Services, and the Child and Family Services Division are all immune from suit for damages under the Eleventh Amendment of the Constitution. They also argue that Wills, in her official capacity, has the same immunity.[3]

█ The United States Supreme Court holds that Congress did not intend § 1983 to apply to States or to arms of the State, so such entities are not "persons" subject to suit within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Groten v. California,* 251 F.3d 844, 851 (9th Cir. 2001). The Eleventh Amendment gives the State and arms of the State sovereign immunity from suit for money damages in federal court. *Quern v. Jordan,* 440 U.S. 332, 338–45, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (holding that § 1983 does not override a State's Eleventh Amendment immunity).

█ Brown argues that the State and its subdivisions are not immune from suit under 42 U.S.C. §§ 2000d et seq., Title 18 of the United States Code, or 2 U.S.C. § 1311. *See* Pl.'s Objection and Opposition (Court's doc. 15) at 7. While Brown is correct that the States lack Eleventh Amendment immunity under Title VI of the Civil Rights Act, *see* 42 U.S.C. § 2000d–7(a), her Complaint does not allege that the State illegally discriminated against her on the basis of her race, color, or national origin, *id.* § 2000d. She cannot proceed under Title 18 of the United States Code because 18 U.S.C. §§ 241,

242, and 1201 define criminal offenses that do not give rise to private causes of action, *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980) (per curiam), and private persons such as Brown have no legally cognizable interest in the prosecution of others, *Linda R.S. v. Richard D.,* 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). As for 2 U.S.C. § 1311, it provides a remedy to Congressional employees who suffer illegal discrimination in a personnel action. It has no bearing on Brown's case.

The Court can only conclude that the Eleventh Amendment bars Brown from proceeding in federal court with claims for money damages against the State of Montana, the Department of Public Health and Human Services, the Child and Family Services Division, and Wills in her official capacity. Those Defendants should be dismissed.

## B. Defendant Wills

Brown also sues Defendant Wills in her individual capacity. *See* Compl. at 5.

### 1. Absolute Quasi–Prosecutorial or Judicial Immunity

█ Absolute immunity "depend[s] on the particular function performed rather than on whether the state officer's position had a general relationship to a judicial proceeding." *Miller v. Gammie,* 335 F.3d 889, 892 (9th Cir.2003) (en banc). "The burden is on the official claiming absolute immunity to identify the common-law counterpart to the function that the official asserts is shielded by absolute immunity." *Id.* at 897.

---

3. Brown sues Wills in both her official and her individual capacity. *See* Compl. at 5. It is not clear that wills has an "official capacity." The Court has no information to suggest that she is in a policy-making position or that she

has the authority to bind the State by her actions. Regardless, it is clear that, to whatever extent Wills has an official capacity, Brown cannot proceed against her.

Absolute immunity shields only those who perform a function that enjoyed absolute immunity at common law. Even actions taken with court approval or under a court's direction are not in and of themselves entitled to quasi-judicial, absolute immunity. Instead, to enjoy absolute immunity for a particular action, the official must be performing a duty functionally comparable to one for which officials were rendered immune at common law. Therefore, a prosecutor's submission of an affidavit to the court as a witness, as in *Kalina*, or a court reporter's preparation of a transcript for the court, as in *Antoine*, were not absolutely immune because those functions were not absolutely immune at common law.

*Id.* (citing *Kalina v. Fletcher*, 522 U.S. 118, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), and *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 113 S.Ct. 2167, 124 L.Ed.2d 391 (1993)).

■■ Social workers are entitled to absolute immunity "in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings." *Meyers v. Contra Costa County Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir.1987). However, prosecutors do not have absolute immunity when they are acting as police officers or detectives, *see, e.g., Burns v. Reed*, 500 U.S. 478, 495, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (declining to recognize absolute immunity of prosecutor in advising police about propriety of hypnotizing suspect and about existence of probable cause), nor do they have absolute immunity when they file an affidavit "personally vouch[ing] for the truth of the facts set forth," even if the affidavit is filed in support of the initiation of judicial proceedings, *see Kalina*, 522 U.S. at 130–31, 118 S.Ct. 502. Only qualified immunity might apply to such functions.

■ Wills was not acting in a quasi-prosecutorial capacity when she decided to investigate hospital staff's allegations concerning Brown's disability, when she sought and obtained information from Alaska regarding child protection proceedings there, when she interviewed Brown at the hospital with two armed police officers, when she took custody of the newborn baby on behalf of the State, or when she filed an affidavit in state court asserting the truth of various matters in a sworn statement.[4] Those functions are analogous to functions performed by investigators, police officers, or complaining witnesses, not prosecutors. *Compare, e.g., Doe v. Lebbos*, 348 F.3d 820, 823–24, 826 (9th Cir.2003) (social worker who prepared petition based on information gathered by others entitled to absolute quasi-prosecutorial immunity); *Mabe v. San Bernardino County*, 237 F.3d 1101, 1109 (9th Cir.2001) (social worker's supervisor, who prepared petition based on information gather by her supervisee, entitled to absolute immunity). Wills is not entitled to absolute quasi-prosecutorial immunity for the actions alleged in Brown's Complaint.

Wills is entitled to absolute immunity for continuing the baby's legal custody with the Department after Judge Macek authorized such custody. However, Brown's Complaint does not allege claims based on Wills' performance of that function.

Finally, Judge Macek's determination in the July 31 Order cannot retroactively impute judicial immunity to Wills' actions. Wills took the child into custody based on

---

4. Brown's response to the motion for summary judgment alleges that Wills "commit[t]ed fraud, fraud upon the court, [and] misrepresentation." Pl.'s Objection (Court's doc. 15) at 7. Those allegations are not contained in her pleading.

her own decision at the hospital. She was not acting pursuant to a court order. *See Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir.1991) ("Because the defendants were not acting under the supervision of a court, it is the qualified immunity standard, rather than the absolute immunity standard, which must govern their conduct."); *Mabe*, 237 F.3d at 1108 n. 2 ("The record supports a finding of probable cause.... However, a showing of probable cause does not ... justify a warrantless removal."). Additionally, Judge Macek's order was based, in part, on information that apparently came to Wills only after she had already taken custody of the baby; the Alaska petition was received on July 29, 2003, not July 28. *See* Am. Pet. for Adjudication of Children [sic] in Need of Aid and for Temporary Placement at 1, *In the Matter of J.B.*, No. 3PA 02–37B CP (Alaska 3d Jud. Dist.undated) ("Alaska Pet.") (showing "received" stamp dated July 29, 2003), attached to Wills Aff. (Court's doc. 13).[5]

In sum, while the general outline of the procedure—that is, taking custody of the child first and asking Judge Macek for an order later—is not necessarily unlawful, it does not reach backward to provide Wills with absolute immunity from suit under § 1983 based on functions she performed before Judge Macek became involved. Nor does the legality of the general procedure under state law have any bearing on the question of whether Wills had legal cause to take custody of Brown's newborn baby. Judge Macek's Order of July 31 is not relevant to the determination of Wills' immunity for actions taken before the petition was filed and the order was issued.

### 2. Qualified Immunity

Defendants also argue that Wills is entitled to qualified immunity. To determine whether qualified immunity applies, the Court must consider, first, whether the facts alleged by the plaintiff, "taken in the light most favorable to the party asserting the injury," show that the defendant violated a constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the answer to that question is no, the defendant is entitled to summary judgment. If the answer is yes, then the next question is whether the constitutional right in question was "clearly established" at the time the defendant allegedly violated it. *Id.* The right must have been "clearly established" in a "particularized" sense; "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202, 121 S.Ct. 2151. Thus, the Court must consider the particular facts of the case to determine whether a reasonable social worker could have believed that her actions were lawful. The Court must consider the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken," *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotation marks omitted); a defendant's subjective thoughts about the action are not relevant, but the information she had and the reasonableness of the inferences she drew from it are relevant. An action for damages will lie only if "a reasonable official" would have understood that what she did violated the plaintiff's rights. *Id.* at 615, 119 S.Ct. 1692 (discussing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Finally, because "a statute ... authorizing particular conduct is a factor which militates in favor of the conclusion

5. Contrary to D. Mont. L.R. 7.2, the exhibits attached to Wills' affidavit are not labeled.

that a reasonable officer would find that conduct constitutional," *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994), the Court must also consider whether authority conferred by state law would lead a reasonable social worker to believe that Wills' actions were lawful.

### (a) Allegation of a Constitutional Violation

■■■■ Brown's Complaint alleges, in essence, that Wills removed her child from her custody even though Wills had no reason to believe that the newborn was in immediate or apparent danger of being harmed. The Due Process Clause of the Fourteenth Amendment "guarantees more than fair process."[6] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Due process "includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.*

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests" recognized and protected by the United States Supreme Court under the Due Process Clause of the Fourteenth Amendment. *Id.; see also id.* at 65–66, 120 S.Ct. 2054 (citing, inter alia, *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)).

The State also has an interest in the health and welfare of children. *See Woodrum v. Woodward County*, 866 F.2d 1121, 1125 (9th Cir.1989),[7] *cited in* Defs.' Br. at 7. Montana expressly declared its interest in "ensur[ing] that there is no forced removal of a child from the family based solely on an unsubstantiated allegation of abuse or neglect." Mont.Code Ann. § 41–3–101(1)(e) (2001).[8] There is no question that "neglectful parents may be separated from their children." *Stanley*, 405 U.S. at 652, 92 S.Ct. 1208. The question in this case is "whether the means used to achieve [the State's] ends are constitutionally defensible." *Id.*

■■■■ Brown's Complaint alleges that her right to due process was violated by Wills' taking custody of her newborn child. Wills does not claim that she obtained

---

6. The State's apparent reliance on post-deprivation process, *see, e.g.*, Defs.' Br. at 7–8, 11, is misplaced. The post-deprivation remedy rule "does not apply where deprivation is predictable, pre-deprivation process is not impossible, and the defendants are specifically charged with the authority to effect the deprivation charged." *Armendariz v. Penman*, 31 F.3d 860, 866 (9th Cir.1994) (citing *Zinermon v. Burch*, 494 U.S. 113, 137–38, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990)), *vacated in part on reh'g en banc*, 75 F.3d 1311, 1316 (9th Cir. 1996). *See also Sorrels v. McKee*, 290 F.3d 965, 972 (9th Cir.2002) ("a deprivation ... caused by conduct pursuant to established state procedure, rather than random and unauthorized action, does state a § 1983

claim.") (internal quotation marks omitted) (ellipsis in original).

7. In *Woodrum*, the court considered a situation where a court authorized the State to take temporary custody of a child. *See id.* at 1123.

8. This statute and others discussed in this Order were amended in 2003, but the amendments were not effective until October 1, 2003, two months after Wills took custody of Brown's baby. Since the volumes of the Montana Code Annotated are published only in odd-numbered years, the 2001 version of the Code is used here.

prior judicial authorization or that she did not take custody of the child. The post-deprivation remedy rule, *see* note 7 *supra,* has no application here. Wills did not "negligently" take custody of Brown's baby, *see* Defs.' Br. at 8; she did so deliberately. Brown asserts that Wills acted "without a court order, search warrant, probable cause, emergency need, or my consent." Compl. at 5.[9] She fairly states a claim for a violation of her right to due process under the Fourteenth Amendment.

### (b) Clearly Established Law

Government officials are required to obtain prior judicial authorization before intruding on a parent's custody of her child unless they possess information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Mabe,* 237 F.3d at 1106 (quoting *Wallis v. Spencer,* 202 F.3d 1126, 1138 (9th Cir. 2000)) (internal quotation marks omitted). The *Wallis* court elsewhere formulated the applicable test in this way: "the state may not remove children from their parents'

custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." 202 F.3d at 1138. "Moreover, the police cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." *Id.*

*Wallis* was applied in *Mabe* to affirm a trial court's denial of summary judgment to a social worker who claimed she was entitled to qualified immunity because, though she lacked a court order, she took custody of a child she believed was being touched in a sexual manner. If the law was clearly established as to that social worker's action, it likewise was clearly established here. The *Wallis* rule was clearly established in February of 2000, more than three years before Wills took custody of Brown's baby without judicial authorization on July 28, 2003.[10] The social worker in *Mabe* was denied qualified immunity for acts she performed in 1995.

The *Wallis* standard precludes removal of a child from a parent's custody without a court order when there is no imminent

**9.** Brown asserts a violation of her Fourth Amendment rights in connection with these acts. The Defendants, however, have read her Complaint as asserting a due process claim under the Fourteenth Amendment, and her Complaint in fact asserts a Fourteenth Amendment claim immediately prior to this description of Wills' actions. Additionally, the Court must liberally construe *pro se* pleadings. Regardless of whether Brown correctly identified the right in question, her factual allegations appear to bring the claim within the purview of Fourteenth Amendment.

**10.** It is true that Wills took custody of Brown's baby at a hospital, while the children in *Mabe* and *Wallis* were removed from their parents' homes. However, the site of the State's interference with the parent-child rela-

tionship was not significant in either case, and both phrased the State's action as "remov[ing] children from their parent's custody," *Wallis,* 202 F.3d at 1138, or "intruding on a parent's custody of her child," *Mabe,* 237 F.3d at 1106. The children's claims in *Wallis* were pled under the Fourth and Fourteenth Amendments, *see* 202 F.3d at 1137 n. 8, but the parents' claims were "properly ... assessed under the Fourteenth Amendment standard for interference with the right to family association." *Id.* Accordingly, it makes no difference whether the interference occurs in the home or elsewhere. In this context, the parent's liberty interest lies not in the sanctity of the home but in the sanctity of the parent-child relationship.

danger or when the danger posed is not serious. It seems to preclude removal without a court order when the removal is based on some of the categories set forth in Montana's description of "harm to a child's health or welfare." *See, e.g., Mabe,* 237 F.3d at 1108–09 (finding no imminent danger of abuse to child); Mont.Code Ann. § 41–3–102(11) (2001).

Other federal appellate courts have applied a reasonable suspicion standard to a State's emergency removal of children from a parent. *See, e.g., Hatch v. Department for Children, Youth and Their Families,* 274 F.3d 12, 21 (1st Cir.2001) (characterizing *Wallis* as a minority rule requiring probable cause "or something fairly close to probable cause" and citing other federal appellate cases applying a reasonable suspicion standard). It is not clear what significance a split in authority among circuit courts of appeal has in determining whether a particular right is "clearly established" for purposes of a qualified immunity analysis. In *Elder v. Holloway,* 510 U.S. 510, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994), the Supreme Court said that "[a] court engaging in review of a qualified immunity judgment should ... use its 'full knowledge of its own [and other relevant] precedents.'" *Id.* at 516, 114 S.Ct. 1019 (bracketed language in *Elder*) (quoting *Davis v. Scherer,* 468 U.S. 183, 192 n. 9, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Does out-of-circuit authority remain "relevant" in a situation where in-circuit authority is clear? *Trevino v. Gates,* 99 F.3d 911 (9th Cir.

1996), suggests that it does not. "In the absence of binding precedent, we look to all available decisional law." *Id.* at 917. *See also, e.g., Capoeman v. Reed,* 754 F.2d 1512, 1515 (9th Cir.1985) (declining to find a right "clearly established" where "there are relatively few cases on point, and none of them are binding"). *Wallis* is binding authority in the Ninth Circuit.

Thus, in this Court, it is clear that *Wallis* supplies the governing federal standard. Nonetheless, *Wallis* leaves open the question whether "reasonable cause" means reasonable suspicion, probable cause, or something else. Consequently, the Court will consider the lower standard.[11] As set forth in Part III.B.2(e) below, the Court will also consider whether Wills had probable cause or reasonable suspicion to believe that Brown's newborn baby was in "immediate or apparent danger of harm," as defined by Montana law.

### (c) What Wills Knew and When She Knew It

 "[T]he relevant question in the present case is whether a reasonable social worker could have believed that taking [Brown's newborn baby] and holding him in temporary protective custody was lawful in light of clearly established law and the information the social worker[ ] possessed." *Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989). "Only the information [Wills] had when [she] made the challenged decisions is relevant." *Id.* at 185 n. 1.

---

**11.** Reasonable suspicion would seem to be what is meant in *Wallis,* given its reference to "specific, articulable evidence." *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intru-

sion."). Other opinions of the circuit, *see, e.g., United States v. Sahanaja,* 430 F.3d 1049, 1052–53 (9th Cir.2005), *United States v. Crawford,* 323 F.3d 700, 714–15 (9th Cir.2003), *United States v. Stokes,* 292 F.3d 964, 967 (9th Cir.2002), also appear to support this conclusion. *Hatch,* of course, reads *Wallis* differently.

Wills submitted an affidavit in support of Defendants' Statement of Uncontroverted Facts. Brown asserts that Wills "lied" in another affidavit Wills filed in the state proceedings, though it is not clear whether Brown means that Wills knew that she was saying things that were not true or whether she means that Wills relied on information that turned out to be false. Brown also challenges the meaning or significance of many of the following statements. However, she does not contest the truth of the following statements in the affidavit Wills filed originally in this Court. The following analysis assumes their truth, without prejudice to Brown's later ability to challenge them.

Wills states that she began investigating Brown on July 28, 2003, when hospital staff "reported that Brown, who was extremely obese, was having difficulty holding her baby for periods of time over 10 minutes." Staff also reported that Brown "need[ed] full assistance in the shower" and "had been living in a motel." Wills learned "about an extensive child neglect case in Alaska pertaining to Ms. Brown and her daughter who had been born there in 2002," more than a year earlier, and that "Alaska was in the process of seeking termination of Brown's parental rights."[12] Consequently, Wills decided to interview Brown "in the presence of law enforcement officers." Wills Aff. (Court's doc. 13) at 2–3, ¶¶ 4–5. Brown's Complaint adds that the officers were armed. See Compl. at 3, ¶ IV. On the same day, July 28, 2003, Wills interviewed Brown at the hospital. Wills avers that Brown's "conduct confirmed the concerns I had based upon the information I had obtained from Alaska." Wills Aff. at 3, ¶ 6. Based on these facts,

Wills decided that "there was a need for emergency protective service under Mont. Code Ann. § 41–3–301(1)," id., that is, that Brown's newborn baby was "in immediate or apparent danger of harm."

(d) Analysis

Regardless of whether the applicable standard is reasonable suspicion or probable cause, Wills' affidavit falls short of showing "specific, articulable" facts that reasonably led her to believe, at the time she took custody, that Brown's baby was in imminent danger of abuse.

Will does not claim that the nursing staff's concerns regarding the length of time Brown could hold the child put the child in imminent danger. Wills might have observed something about Brown's behavior that suggested she was physically unable to care for an infant. She does not say so. She does not explain whether or how the fact that Brown needed help in the shower or the fact that she was living in a motel made it reasonable for Wills to suspect that Brown would neglect or abuse her baby. Wills does not contend that each of these items of evidence, taken together, indicated a likelihood of abuse or severe neglect. Her actions apparently were largely based on concerns resulting from her contacts with persons in Alaska.

Wills does not explain, however, what she learned in those contacts about the "extensive child neglect case in Alaska." Wills apparently knew that the case had been ongoing for a year with no judicial determination that Brown was unable or unwilling to parent her child. Wills does not describe any of the alleged neglect about which she was told, she does not explain what she thought "neglect" meant

---

12. Brown asserts both that the Alaska case did not seek termination and that it had nothing to do with her newborn baby. See Pl.'s Resp. (Court's doc. 15) at 4, ¶ 14. It is not clear whether Brown would agree that the Alaska case sought termination of her parental rights to her daughter.

in Alaska's terms or why she thought that, and she does not explain why she believed such neglect would likely be repeated with respect to Brown's newborn baby or why it would place the infant in imminent danger. The information that she later obtained, after she had removed the infant, cannot be used to justify said action.

Given the absence of any "specific, articulable" facts in Wills' affidavit, the Court has no choice but to conclude that Wills learned only that a social worker in the State of Alaska was pursuing termination of Brown's parental rights to her daughter. While that information certainly might warrant further inquiry, it does not support a reasonable suspicion that Brown's infant son was in imminent danger of abuse, and it does not justify taking custody of the child without further investigation and without a court order.

The record before the Court shows that Wills did not obtain a copy of the Alaska social worker's petition until the day *after* she took custody of Brown's baby, *see* Alaska Pet. at 1; even when she received the Alaska petition, she should have noticed that it was signed four months previously, on March 8, 2003, and had not been judicially endorsed.[13] Finally, Wills' statement that Brown's "conduct confirmed the concerns I had based upon the information

I had obtained from Alaska" is itself vague and conclusory and does not provide specific facts demonstrating imminent danger. Further, it appears that Wills had decided to take the infant even before she ever saw Brown. In her affidavit dated July 30, 2003, submitted to the Eight Judicial District in support of the request for "Emergency Protective Services and Temporary Legal Custody," Wills stated: "Because of the extensive history [learned from Alaska family services authorities], I went to the hospital, with officers, to inform Alice that I would be placing [the infant] into protective custody until his safety could be established." See Exhibit D to Wills' Affidavit (Court's Doc. No. 13).

In sum, Wills decided to remove Brown's newborn baby from the hospital based on the fact that a social worker in the State of Alaska was seeking—and had not obtained—judicial termination of Brown's parental rights to another child. On any standard, that information, without more, does not amount to "specific, articulable evidence" that Brown's baby was in imminent danger of abuse. Nor has Wills shown that the scope of her intrusion—preventing an infant less than twenty-four hours old from interacting with his mother for a period of *at least* three full days [14]—

---

13. In fact, there is no indication anywhere in the record before this Court that the Alaska petition was actually filed in a court of the State of Alaska in the same form in which it is presented here—much less that it was judicially found to contain true statements. In addition, it appears that the petition contains several discrepancies. For example, it does not explain Brown's seventeen-month pregnancy between February 28, 2001, when she was reportedly 36 weeks pregnant, and March 21, 2002, when she appeared at a hospital "for induction of the baby." Alaska Pet. at 2, ¶ 5. *See also id.* at 2, ¶ 4 (listing, on one hand, "abandonment," and, on the other hand, a parent's mental illness and substan-

tial risk of physical harm by a parent as reasons supporting protective custody).

14. Wills took custody on July 28. On July 31, Judge Macek provided a judicial determination of probable cause to support the infant's removal. Had Judge Macek not found probable cause, Brown would still have been deprived of her interest in her newborn son's care and custody for 72 to 96 hours.

Further, while Montana law requires that an abuse or neglect petition be *filed* within 48 hours of the department's seizure of a child, excluding weekends and holidays, the United States Supreme Court holds that a *judicial determination* of probable cause must occur

was suited to the harm she perceived. As the Ninth Circuit stated in *Mabe*, assuming that a warrant could have been obtained within a day or two, "it is difficult to understand how the further delay of a few hours necessary to obtain the warrant would have put [the child] in imminent danger of serious physical injury." *Mabe*, 237 F.3d at 1108.

It may ultimately be proven that Wills can produce evidence that she had reasonable suspicion or even probable cause, but at this stage of the case the evidence must be viewed in the light most favorable to the plaintiff and all questions of fact must be resolved by a jury. *See Wallis*, 202 F.3d at 1138.

The State's references to other cases are conclusory and fail to address what Wills actually knew in this case, and when she knew it. The State seems to take the position that a social worker's private, undisclosed rationale is sufficient to justify action she takes without a court order. *See, e.g.*, Defs.' Br. at 8–9, 13–14 ("under the circumstances known to Ms. Wills, the interest of the State in the welfare of the child outweighed the interest of Plaintiff and justified the State's temporary custody of the child pending a timely court determination."). It references Brown's "history of inappropriate behaviors with her daughter, noncompliance with her treatment plan, and hostile and threatening behaviors," *id.* at 11, but does not specifically state what Wills knew, if anything, about those behaviors or non-compliance with a treatment plan at the time she took custody of Brown's newborn infant. Nor does she say why those matters made it reasonable for her either to suspect that

Brown would imminently abuse her newborn child or to believe that the only option was to take custody of the child. Based on the record currently before the Court, there exists a question of material fact whether a reasonable social worker could have believed that her conduct was lawful because it is unclear that the infant in question faced an immediate threat of serious physical injury.

**(e) Montana Law**

The Court next must consider whether Montana law could have persuaded a reasonable official that her actions were lawful. When the Montana Legislature has enacted a statute, a social worker is ordinarily entitled to rely on the assumption that the drafters, legislators, and legal counsel have considered the implications and concluded that the statute "is a valid and constitutional exercise of authority." *Grossman*, 33 F.3d at 1209. On the other hand, "[w]here a statute authorizes official conduct which is patently violative of fundamental constitutional principles," a social worker is not entitled to qualified immunity. *Id.* "Similarly, an officer who unlawfully enforces an ordinance in a particularly egregious manner, or in a manner which a reasonable officer would recognize exceeds the bounds of the ordinance, will not be entitled to immunity even if there is no clear case law declaring the ordinance or the officer's particular conduct unconstitutional." *Id.* at 1210.

Mont.Code Ann. § 41–3–301(1) (2001), the statute under which Wills took custody of Brown's baby, provides that "[a]ny child protective social worker of the department . . . who has reason to believe any youth is

---

within 48 hours of a warrantless arrest, *including* weekends and holidays, except in truly extraordinary circumstances. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 57, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Four

justices dissented on the grounds that 48 hours, including weekends and holidays, was too long to await a judge's determination of probable cause to support warrantless state action.

in immediate or apparent danger of harm may immediately remove the youth and place the youth in a protective facility." Under the facts of this case, this provision was triggered after Wills received a report from nursing staff at the hospital, *see id.* § 201(1), (2)(b), determined that an investigation was required, and so was required to "promptly conduct a thorough investigation into the circumstances surrounding the allegations of abuse or neglect of the child," *id.* § 202(1). If, based on the investigation, Wills had "reasonable cause to suspect that the child suffered abuse or neglect," she could "provide protective services to the child pursuant to [§ ] 41–3–301." *Id.* § 202(5)(a).[15]

"Reasonable cause to suspect" is defined by statute as "cause that would lead a reasonable person to believe that child abuse or neglect may have occurred or is occurring, based on all the facts and circumstances known to the person." *Id.* § 102(19) (emphasis added). The Court has not located any Montana Supreme Court opinion that addresses whether "reasonable cause to suspect . . . abuse or neglect," as set forth in § 41–3–301, means probable cause, reasonable suspicion, or

something else.[16] In other areas of Montana law, "reasonable cause" seems to mean the same thing as "reasonable suspicion." *See, e.g., In re D.R.B.,* 320 Mont. 516, 88 P.3d 808, 811–12 ¶¶ 31–35 (2004); *see also id.* at 813–14 ¶¶ 48–49 (Gray, Ch. J., dissenting); *State v. Dawson,* 295 Mont. 212, 983 P.2d 916, 919–20 ¶ 19 (1999). Each of these cases turned on whether police officers had a "particularized suspicion" of wrongdoing—a phrase that resonates with *Terry v. Ohio.*

In an older case, *Gross v. Myers,* 229 Mont. 509, 748 P.2d 459 (1987), the court considered whether Myers, a licensed clinical social worker, had "reasonable cause to suspect that a child . . . is an abused or neglected child" when she knew that a client of hers had sexually abused her daughters in the past and when she believed sexual abuse to be "a chronic behavior which, without therapeutic intervention, is subject to repetition, even after long lapses of time." *Id.* at 461. Myers was a defendant in a lawsuit filed by a person whose name she reported to the department, but if she had "reasonable cause to suspect . . . abuse," she was required to make the report under Mont.Code Ann.

15. Mont.Code Ann. § 41–3–203(1) immunizes reporters and investigators, including social workers, from civil liability "unless the person was grossly negligent or acted in bad faith or with malicious purpose or provided information knowing the information to be false." The State cannot extend immunity to individuals subject to suit under 42 U.S.C. § 1983; that would eviscerate the statute. Congress did not abrogate immunities that were "well grounded in history and reason," *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), when it enacted the Civil Rights Act of 1871 (now 42 U.S.C. § 1983), but neither did it extend to the States the opportunity to take their own officials out of the statute's scope. *See, e.g., Ex parte Young,* 209 U.S. 123, 160, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (a state employee who violates federal law "is in that case stripped of his official or representative char-

acter and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.").

16. In *Matter of K.C.H.,* 316 Mont. 13, 68 P.3d 788 (2003), the State took custody at the hospital of a newborn girl, based on the previous termination of the mother's parental rights to three other children. The father sought a ruling on the constitutionality of Mont.Code Ann. § 41–3–301 in that context. The Montana Supreme Court declined to reach the issue because the father's notice of appeal referred to the final judgment and not to the trial court's interlocutory decision on the constitutionality of the statute. *See id.* at 793 ¶¶ 27–30.

§ 41-3-201(1), (2) (1985). Noting that "[t]he purpose of the statutory requirement for the report of child abuse is to allow qualified persons ... to make the necessary investigation," the court concluded that reasonable cause was established under the circumstances. *See* 748 P.2d at 461-62.

Where federal law limits social workers who act without judicial authorization to show a reasonable suspicion that a child is in imminent danger of abuse and where it restricts their action to what is necessary to avert that imminent danger, Montana law appears to permit social workers to remove a child from a parent's custody without a court order based solely on reasonable suspicion of *neglect*, even neglect which does not amount to an imminent possibility of serious harm. It also authorizes social workers to act on the basis of an apparent danger of harm. That word may mean a patently visible danger, in which case it seems redundant in context with the word "immediate," or it might mean only a seeming danger. The latter interpretation might introduce so much ambiguity as to make the statute violative of fundamental constitutional principles.

But the ambiguity of Montana law on these points is irrelevant where Wills has not shown specific and articulable evidence of a *seeming* danger of *neglect* to justify taking custody of Brown's newborn baby without judicial approval. There exists a material issue of fact whether a reasonable social worker could believe that the existence of pending, unadjudicated proceedings in another jurisdiction regarding another child established an imminent or apparent danger of harm to Brown's newborn baby such that it was necessary to take the child from the hospital without judicial approval.

**(f) Conclusion**

On this record, Wills is not entitled to qualified immunity for her decision to take custody of Brown's newborn infant at the hospital. Defendants have failed to demonstrate that Wills is entitled to judgment as a matter of law.

Based on the foregoing, the Court enters the following:

### RECOMMENDATION

Defendants' motion for summary judgment (Court's doc. 7) should be GRANTED as to Plaintiff's claims for money damages against Defendants State of Montana, the Department of Public Health and Human Services, the Child and Family Services Division, and Wills in her official capacity. The motion should be DENIED as to Defendant Wills in her individual capacity.

The Clerk of Court shall serve a copy of the Findings and Recommendation of the United States Magistrate Judge upon the parties. The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to these findings must be filed within twenty (20) calendar days after the entry date reflected on the Notice of Electronic Filing, or objection is waived.

*Plaintiff Brown must immediately inform the Court and defense counsel of any change in her mailing address.* Failure to do so may result in dismissal of this case without notice to her.